**NORFOLK & WESTERN RAILWAY CO., Plaintiff,**

v.

**ACCIDENT & CASUALTY INS. CO. OF WINTERTHUR, et al., Defendants.**

**Civ. A. No. 89–0344–R.**

United States District Court,
W.D. Virginia,
Roanoke Division.

May 15, 1992.

See also 796 F.Supp. 925.

W. Fain Rutherford, Phillip D. Payne, IV, Woods, Rogers & Hazlegrove, Roanoke, Va., Stephen A. Trimble, John M. Clifford, Patrick Kavanaugh, Hamilton & Hamilton, Washington, D.C., Russell H. Hart, Bruce L. McSpadden, Stuart & Branigin, Lafayette, Ind., for Norfolk and Western Ry. Co.

David Florin, Wilson, Elser, Moskowitz, Edelman & Dicker, Alexandria, Va., for Fuji Fire & Marine Ins. Co.

Patrick M. Shine (Pro hac vice), Nancy J. Gleason (Pro hac vice), Gleason, McGuire & Shreffler, Chicago, Ill., Elizabeth Medaglia, Margery J. Lexa (Pro hac vice), Jackson & Campbell, P.C., Washington, D.C., for Allstate.

George Marshall Moriarty, Kenneth W. Erickson, Eric Smith, Ropes & Gray, Boston, Mass., David Overlock Stewart, Ropes & Gray, Washington, D.C., T. Daniel Frith, III, Mundy, Rogers & Frith, Roanoke, Va., Peter M. Brody (Pro hac vice), Washington, D.C., for London Market Companies.

Kathleen Taylor Sooy, Elizabeth E.S. Skilling, Joseph L.S. St. Amant, McGuire,

Woods, Battle & Boothe, Richmond, Va., for Admiral Ins. Co., Central Nat. Ins. Co. of Omaha, The Ins. Co. of Florida, Protective Nat. Ins. Co., Southern American Ins. Co., Canadian Universal Ins. Co. Ltd., Northwestern Nat. Ins. Co. of Milwaukee, Northwestern Nat. Cas. Ins. Co. and Bellefonte Ins. Co.

Jim H. Guynn, Jr., Parvin, Wilson, Barnett & Hopper, P.C., Roanoke, Va., Andres H. Marks, Stuart H. Newberger, William L. Anderson, Crowell & Moring, Washington, D.C., for California Union Ins. Co. and Ins. Co. of North America.

James W. Greene, William F. Fawcett, Jr. (Pro hac vice), Bromley, Brown & Walsh, Washington, D.C., Randall M. Starrett, II, Maria T. Ehrlich (Pro hac vice), Bromley, Brown & Walsh, Falls Church, Va., for Employers Ins. of Wausau, American Reinsurance Co., Yosemite Ins. Co. and General Reinsurance Co. and United Nat. Ins. Co.

S.D. Roberts Moore, Phillip V. Anderson, Walter H. Peake, III, Melissa W. Robinson, Gentry, Locke, Rakes & Moore, Roanoke, Va., for American Home Assurance Co., Birmingham Fire Ins. Co. of Pennsylvania, Granite State Ins. Co., Landmark Ins. Co., Lexington Ins. Co., Nat. Union Fire Ins. Co. of Pittsburgh, Pa., New Hampshire Ins. Co., The Ins. Co. of State of Pa., Audubon Indem. Co., American Centennial Ins. Co., First State Ins. Co., Highlands Ins. Co., Royal Indem. Co. and Southeastern Fidelity Ins. Co.

Gerald F. Ivey, Michele S. Ponte, Wilson, Elser, Moskowitz, Edelman & Dicker, Washington, D.C., for Mead Reinsurance.

Stuart L. Peacock (Pro hac vice), K. Thomas Shahriari, Donald M. Gilberg, Mark Westerfield, Bivona & Cohen, Washington, D.C., for American Ins. Co., Firemen's Fund Ins. Co. and Nat. Sur. Corp.

Philip G. Gardner, Gardner, Gardner & Barrow, P.C., Martinsville, Va., for Federal Ins. Co.

Lanier Woodrum, Fox, Wooten & Hart, Roanoke, Va., for Allstate Ins. Co. and Northbrook Excess and Surplus Ins. Co.

Susan W. Spangler, Fox, Wooten & Hart, Roanoke, Va., for Employer's Mut. Cas. Co.

Richard Gimer, Stephen L. Humphrey, Kathryn A. Underhill, Hopkins, Sutter, Hamel & Park, Washington, D.C., for Tranp. Mut. Ins. Co. and Employers Surplus Lines Ins. Co. (Commercial Union).

Miguel E. Rubio (Pro hac vice), Robert Heggestad (Pro hac vice), Casey, Scott, Canfield & Heggestad, P.C., Washington, D.C., Mark Weiss, Roberts & Rab, Woodbridge, Va., for Harbor Ins.

Steven K. Davidson, Steptoe & Johnson, Washington, D.C. (Roger E. Warin, of counsel), for Home Ins. Co.

Howard W. Dobbins, Williams, Mullen, Christian & Dobbins, P.C., Richmond, Va., Wendy H. Kock, Griffith & Burr, P.C., Philadelphia, Pa., for Transamerica Premier Ins. Co.

Kevin E. Wolf (Pro hac vice), Lorraine M. Armenti, Barbara C. Robertson, McElroy, Deutsch and Mulvaney, Morristown, N.J., William B. Hopkins, Jr., Martin, Hopkins, Lemon & Carter, P.C., Roanoke, Va., for Intern. Surplus Lines Ins. Co.

Michael D. Gallagher, Robert Thurston, German, Gallagher & Murtagh, Philadelphia, Pa., David P. Joyce, Stone, Worthy, Reynolds & Joyce, Martinsville, Va., for Stonewall Ins. Co.

Bill Marks, Milwaukee, Wis., for Integral Ins. (Incorporated as Old Reliable—Changed name to Integral on 5/20/83).

George Vallone, East Orange, N.J., for American Home Assur. Co., Birmingham Fire Ins. Co. of Pennsylvania, Employers Surplus Lines Ins. Co., Granite State Ins. Co., The Ins. Co. of State of Pa., Landmark Ins. Co., Lexington Ins. Co., Nat. Union Fire Ins. Co of Pittsburgh, Pa., New Hampshire Ins. Co., Audubon Ins. Co. and Ins. Co. of Baton Rouge.

Jan Kravitz, American Universal Group, Providence, R.I., for Canadian Universal Ins. Co.

Scott Riley, Wilmington, Del., for American Centennial Ins. Co.

## MEMORANDUM OPINION

TURK, Chief Judge.

### POSTURE OF THE CASE

The court takes jurisdiction over this case pursuant to the diversity statute, 28 U.S.C. § 1332.

The plaintiff's motion for partial summary judgment and the defendants' cross-motion for partial summary judgment are presently before the court.[1] The motions have been extensively briefed and argued. They are ripe for decision.

### BACKGROUND

Noise induced hearing loss ("NIHL") is at the center of this dispute over excess insurance coverage. As its name suggests, NIHL is a loss of hearing attributable to exposure to noise. The plaintiff in this case, the Norfolk & Western railroad ("the railroad" or "NW"), generates a tremendous amount of noise throughout its vast system. A number of railroad employees have allegedly suffered hearing loss as a result of exposure to this noise and the railroad's negligence in failing to adequately protect them from its hazardous effects. According to the railroad, the claims filed by these injured employees under the Federal Employers Liability Act have already cost the railroad more than ten million dollars. They have the potential to cost the railroad much more during the coming years and decades.

The insurance policies in question provide excess coverage for the years 1960 to 1986. The level at which any given policy provides coverage varies, but in no case does the railroad's self-insured retention, the amount which the railroad pays before any coverage is provided, fall below one million dollars per occurrence. The motions before the court concern the manner in which the underlying claims against the railroad may be aggregated to satisfy the self-insured retention limits. The railroad seeks a declaration that NIHL is a bodily injury and that all of the underlying hearing loss claims arose out of one occurrence. The insurers oppose the railroad's motion and move for a declaration that NIHL is an occupational disease.

### RELEVANT POLICY PROVISIONS

The court is asked to interpret contract language which, according to the railroad, is common to the vast majority of the policies at issue in the case. The defendants dispute the railroad's contention that the language quoted below is typical. Recognizing that the language may vary, the court believes it to be sufficiently common to justify the present attempt to interpret it. Of course, the present decision will not determine the rights of those insurers whose policies do not contain provisions similar in all material respects to the quoted language.

The insuring provision which the court is asked to interpret provides:

> To indemnify the Assured for any and all sums which the Assured shall be legally liable to pay and shall pay as damages and expenses ... on account of personal injuries arising out of occurrences happening during the policy period as stated in the schedule forming part of this policy and due to the conduct of the Assured's business.

The insurers liability is stated as follows:

> Liability shall attach to Underwriters only after the Assured has paid or has been held liable to pay the full amount of ultimate net loss liability as stated in Item 5(a) of the Schedule ultimate net loss in respect of each occurrence (hereinafter referred to as "underlying limit") and the Underwriters shall then be liable to pay up to a further amount as stated in Item 5(b) ultimate net loss in respect of each occurrence.

The term "occurrence" is defined as follows:

> It is understood and agreed that the term "occurrence" wherever used herein, shall

---

1. This opinion will address only the original motion for partial summary judgment and the defendants' first cross-motion. The motion brought by defendant Employee Surplus Lines Insurance Company, regarding the railroad's alleged failure to give timely notice, will be decided in a separate opinion and order.

mean one happening or series of happenings, arising out of or due to one event.

The term "personal injuries" is defined as follows:

The term "personal injuries" wherever used herein shall include, but not by way of limitation, bodily injuries, sickness, disease and death, suffered by any person or persons, including employees of the Assured injured during the course of their employment by the Assured, and as respects employees, occupational disease, including death at any time resulting therefrom, by reason of all operations of the Assured.

The policies also provide:

This policy shall only indemnify the Assured against their liability for occupational disease in cases where the employee's (employees') cessation from work, as a result thereof, first occurs during the period of insurance covered by this policy.

## APPLICABLE LAW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(c). For the purpose of deciding the motion for summary judgment, the facts will be considered in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The defendants contend that disputed issues of material fact—namely, variations in policy wording—prevent the court from deciding the plaintiff's motion. The court does not agree. The court will address and decide the plaintiff's motion and the defendants' cross-motion with the understanding that the present decision will not determine the rights of those insurers whose policies do not contain provisions similar in all material respects to the language quoted above.

■ The parties agree that Virginia law controls the interpretation of the policy language at issue. Under Virginia law, unambiguous policy provisions are to be read according to their plain meaning. *Carter v. Carter*, 202 Va. 892, 121 S.E.2d 482 (1961). Where two constructions of a policy provision are equally plausible, the one which would maximize indemnity is to be given effect. *Hill v. State Farm Mut. Auto. Ins. Co.*, 237 Va. 148, 375 S.E.2d 727 (1989). The Virginia courts have not explicitly adopted the "reasonable expectations" test, by which a court examines the objectively reasonable expectations of the contracting parties to give meaning to ambiguous policy provisions, but this court believes that the "reasonable expectations" doctrine is enough a part of Virginia law to warrant its application to the facts of this case. The reasonable expectations doctrine grows out of the doctrines which favor indemnity. Couch on Insurance 2d (Rev ed) § 15:16. The doctrines favoring indemnity are clearly a part of Virginia law, so the court concludes that the application of the reasonable expectations doctrine is proper.

■ The defendants argue that neither the reasonable expectations test nor the doctrines favoring indemnity out of which that test grows are applicable to this case. According to the insurers, these doctrines are intended to protect parties who enter into contracts of adhesion. They give the benefit of the doubt to innocent purchasers of insurance who have neither the capability to understand nor the bargaining leverage to alter the terms of form contracts. The insurers argue that the railroad bargained for the terms at issue from a position of financial and informational equality. While the court does not believe that the railroad was totally unsophisticated in its negotiation of the terms which are presently at issue, the railroad was not so sophisticated that it should be denied the benefit of the doctrines favoring indemnity. The railroad may have been the financial equal of the insurers at the time that the contracts were negotiated, but it was never the informational equal. In every instance, the insurers benefited from the wisdom that comes from negotiating many more of these contracts than the railroad. The

court holds that the doctrines favoring indemnity, including the reasonable expectations test, are applicable.

## DISCUSSION

I. *The "Bodily Injury"/"Occupational Disease" Distinction.*

The "bodily injury"/"occupational disease" question has become more complex as the parties have moved through this stage of the litigation. In its initial motion for partial summary judgment, the railroad requested that NIHL be declared a bodily injury and that the underlying claims which give rise to the present litigation be declared to have arisen out of a single occurrence. The defendants opposed this motion and cross-moved for a declaration that NIHL is an occupational disease. In response to the defendants' cross-motion, the railroad argued that NIHL may not be categorized as an occupational disease without careful consideration of the coverage implications that such a holding would have. The railroad is particularly concerned with "paragraph six" of the policies, which may limit coverage for occupational disease claims depending upon whether the claimants ceased work because of NIHL. The defendants vigorously contend that any consideration of the meaning of paragraph six would be premature and improper at this time, but they agree with the railroad that the narrower question of whether NIHL is an injury or a disease is ripe for decision.

For the purpose of interpreting the policy language at issue in this case, the court will declare NIHL to be an occupational disease. Believing that further discovery would not substantially add to the arguments in support of the opposing positions which the parties take with regard to the interpretation of paragraph six, the court will address that provision here. The court holds that paragraph six unambiguously excludes from coverage any NIHL claims which did not result in a claimant's cessation from work.

A. NIHL is an Occupational Disease.

■ The defendants rest their argument that NIHL is an occupational disease on the fact that a number of courts as well as medical and railroad commentators have referred to NIHL as disease rather than injury. *See e.g., Alabama Dry Dock & Shipbuilding Corp. v. Sowell,* 933 F.2d 1561, 1568 (9th Cir.1991); *Barger v. Mayor and City Council of Baltimore,* 616 F.2d 730, 732 n. 1 (4th Cir.1980); *Marie v. Standard Steel Works,* 319 S.W.2d 871, 877 (Mo.1959); Report of the 46th Membership Meeting of the Medical and Surgical Officers of the Association of American Railroads 124 (1966) (Remarks of Dr. R. Graham); Glorig, Noise: Mountain of Molehill, *National Safety News* 26, 80 (June 1960); Fox, Occupational Hearing Loss: Wisconsin's Approach to the problem, *Industrial Medicine and Surgery* 310, 311 (July 1956); Goldner, Occupational Deafness, 12 A.M.A. Archives of Industrial Health 643 (1955).[2] The railroad disputes the importance of these references, arguing that because the medical profession rarely finds cause to distinguish between injury and disease, the references cited represent convenient labelling rather than any considered conclusion on the part of the commentators. The railroad submits the affidavit of a hearing loss expert, Paul R. Lambert, M.D., in support of its position that NIHL is a bodily injury. Dr. Lambert argues that NIHL may be properly categorized as "an injurious process" involving "a series of micro-traumas to the structure of the ear." Dr. Lambert's opinion is based in part upon the definitions of injury and disease which he offers:

> Injury—an injury involves exposure to a specific trauma. The resulting dysfunction of the body is directly related to the intensity or magnitude of the trauma and to the length of time the individual is exposed. Removal of the individual from

2. These citations are only a few of the many to which the defendants point the court. Having reviewed the materials submitted by the defendants, the court can say that NIHL has been referred to as "disease" or "occupational disease" in a large number of reference materials with which the defendants and the railroad would be familiar.

the specific trauma usually halts the on-going damage, and healing may spontaneously occur.

Disease—a disease is an alteration of an organ system or body function characterized by a set of signs and symptoms and following a specific course or natural history. Many diseases have a self-limited course with complete recovery expected—e.g. upper respiratory viral infection, otitis media (middle ear infection) or hepatitis. Some disease may cause permanent dysfunction—e.g., cancer. In most cases, the course of a disease, once triggered, is not affected by removal of the individual from the causative agent, but can be altered by medications or surgery—e.g. use of antibiotics, excision of a tumor.

The defendants' affiant, Mary Ann Frable, M.D., does not define disease and injury, but she carefully describes the pathology of NIHL in support of her conclusion that it is a disease. Dr. Lambert and the railroad point out that Dr. Frable does not dispute that NIHL arises from an injurious process, even if she concludes that it is a disease.

After closely examining the arguments that the parties and their affiants make, the court recognizes that any attempt that it would make to substitute its analysis for that provided by the medical experts would be futile. The futility of the attempt can be readily appreciated through even a brief consideration of the definitions quoted above. The application of these definitions to the court's understanding of the nature of NIHL leads the court to no justifiable conclusion in favor of either position. Ultimately, the answer to the injury/disease question must come from an analysis of the parties' expectations with regard to the contract rather than the medical analysis provided by the parties and their affiants.

An examination of the authorities cited by the defendants in support of their position that NIHL is an occupational disease leads the court to conclude that whether a medical professional would consider NIHL to be an injury or a disease, the railroad had every reason to believe that NIHL fell into the category of occupational disease when it entered into the insurance contracts at issue in this case. The number and breadth of the sources which refer to NIHL as an occupational disease put the railroad on notice that its insurance contracts would be interpreted according to the premise that NIHL is an occupational disease. Any objectively reasonable railroad would contract from this premise. This being the parties' only reasonable expectation with regard to the issue, the court holds that, for the purpose of interpreting the policies at issue in this case, NIHL is an occupational disease.

B. "Paragraph Six" Operates As An Exclusion.

■ The court must now address the implications that its holding will have on coverage. The policy provision which the railroad urges the court to interpret in the event that NIHL is held to be an occupational disease is the provision referred to as paragraph six. Paragraph six provides:

> This policy shall only indemnify the Assured against their liability for occupational disease in cases where the employee's (employees') cessation from work, as a result thereof, first occurs during the period of insurance covered by this policy.

The railroad argues that this provision is ambiguous. First, the railroad contends that the provision may be read to exclude from coverage all occupational disease claims in which a claimant failed to cease work. Alternatively, the railroad argues that the provision may be read as a selection device, which does not affect coverage of claims which did not result in a cessation from work, but does affect coverage in those cases in which a claimant did cease work. Given this alleged ambiguity, the railroad argues that the provision must be interpreted to maximize indemnity. In other words, it must be read to apply only to claims involving a cessation rather than as an exclusion of all claims in which a cessation did not occur.

The railroad's argument must fail because the language of paragraph six is not

ambiguous. According to its plain meaning, paragraph six operates as an exclusion of all claims in which a cessation from work does not occur. The language "This policy shall *only* indemnify the Assured ... in cases where the employee's ... cessation from work ..." limits the application of the policies to claims in which the claimant ceased work. In support of its argument that the paragraph operates as a selection device, the railroad would have the court emphasize the language "first occurs" rather than the language of limitation quoted above. This proposed emphasis is not logical, and it would not do justice to the plain meaning rule to interpret paragraph six in this way. Accordingly, the court holds that paragraph six is not ambiguous.

■ That the railroad is able to proffer two meanings for the language does not necessarily make the language ambiguous. *See Brand Dist., Inc. v. Insurance Co. of N.A.*, 400 F.Supp. 1085, 1090 (E.D.Va.1974), *rev'd on other grounds*, 532 F.2d 352 (4th Cir.1976). Competent legal counsel can always make a colorable argument that language is ambiguous by proffering two meanings. Ultimately, the court must examine both proffered meanings and decide if each is plausible. In this case, only one interpretation is plausible. That is the one which reads paragraph six to operate as an exclusion of all claims in which the claimant did not cease work as a result of NIHL.

The railroad's argument that the interpretation offered by the court swallows up the indemnity provision of the contract does not dictate a contrary result. The court is confident that the parties intended to swallow up the indemnity provision inasmuch as they intended to limit coverage with respect to occupational disease to claims which resulted in the claimant's cessation from work. Paragraph six is the product of what appears to the court to be entirely rational contracting. Like so many provisions, it limits coverage according to an arbitrary but objectively determinable criterion.

Accordingly, the court holds that paragraph six operates to exclude from coverage any claim of NIHL which does not result in the claimants' cessation from work.

## II. *The Number of Occurrences Issue.*

■ In its original motion, the railroad asked the court to declare that all of the underlying hearing loss claims which gave rise to this litigation arose out of a single occurrence. The remaining importance of this issue is put into question by the court's holding in Part I of this opinion. However, because the briefs submitted by the parties suggest that the issue remains relevant for at least some of the policies, the court will decide the issue.

The railroad contends that the occurrence language in the policies is unambiguous. The railroad applies that language to the facts of this case and concludes that all of the underlying hearing loss claims arose out of a single occurrence—the railroad's alleged continuing negligence with respect to excessive noise in the workplace. Alternatively, the railroad argues that if the court finds the policy language to be ambiguous, Virginia law favors the construction which would indemnify the insured. For the reasons set out below, the court will deny the railroad's motion.

### A. The Plausibility of the "Single Occurrence" Interpretation.

First, the court holds that the occurrence language in the policies is ambiguous. As applied to the fact of this case, that language might permit a number of interpretations. The court must therefore determine whether the single occurrence interpretation offered by the railroad is plausible. If it is, it must be given effect as the interpretation which would maximize indemnity. *Hill v. State Farm Mut. Auto. Ins. Co.*, 237 Va. 148, 375 S.E.2d 727 (1989).

The "cause" test is at the heart of the railroad's legal argument in support of its single occurrence position. According to this test, the number of occurrences is determined by focusing on the cause of the alleged injuries which give rise to the claims with respect to which the insured seeks indemnity. In *Owens–Illinois, Inc.*

*v. Aetna Casualty And Surety Company,* 597 F.Supp. 1515 (D.D.C.1984), the court applied the cause test to hold an insulation manufacturer's manufacture and sale of a product containing asbestos to be a single occurrence for the purpose of determining liability with regard to numerous asbestosis claims against the manufacturer. The court explained:

> ... [T]he calculation of the number of occurrences must focus on the underlying circumstances which resulted in the personal injury and claims for damage rather than each individual claimant's injury.

*Id.* at 1525. This approach, taken by a number of courts, *see Michigan Chemical Corp. v. American Home Assurance Co.,* 728 F.2d 374 (6th Cir.1984); *Appalachian Insurance Co v. Liberty Mutual Insurance Co,* 676 F.2d 56 (3rd Cir.1982); *Champion International Corp. v. Continental Casualty Co.,* 546 F.2d 502 (2nd Cir.1976), has been validated as the law of Virginia by the District Court for the Eastern District in *American Casualty Co. of Reading v. Heary,* 432 F.Supp. 995, 997 (E.D.Va. 1977). *Heary* involved an automobile accident which resulted in claims made by several parties. The total amount of the claims exceeded $5,000.00, so the court was required to interpret the $5,000 per occurrence liability limit in the insured's policy. The court applied the cause test and concluded that all of the claims arose out of a single occurrence—the automobile accident.

The railroad argues that the cause test, as applied to the facts of this case, dictates a holding of single occurrence. The difficulty that the court has with this argument is that it leads to a result which would defy common sense. The typical single occurrence giving rise to multiple claims is the automobile accident which gives rise to a chain of events which results in injury to several parties. This was the case in *Heary.* The present case is not like *Heary,* however. In this case, a wide variety of machines in a number of different locations created a variety of sounds over the course of a number of years. Railroad employees working near these machines suffered injury to their hearing as a result of exposure to these sounds. The railroad contends that its alleged negligence in failing to protect its employees from the hazards of this noise was the cause of the claimants' injuries and therefore the single occurrence out of which all of these claims arose. While the railroad's negligence may indeed have been a cause of the injuries, calling that negligence the single occurrence out of which the claims arose is nonsensical.

The railroad's argument allows the cause test to sweep too broadly and arrives at a result which defies common sense. Many different sounds damaged the hearing of many employees in many places over the course of many years, making this case one in which multiple occurrences created multiple injuries. For the purpose of interpreting the policy language, a relevant occurrence might be the generation of noise by a particular machine or by a number of machines in a particular physical plant. It may even be the railroad's negligence with regard to employees who work around a particular machine or in a particular plant. The occurrence contemplated by the language of the policies cannot logically be the railroad's system-wide negligence with respect to its employees, however. The railroad's argument is flawed to the extent that it removes any limit from the category of things which might be found to be a cause. By moving the analysis of cause to a level sufficiently general to support an interpretation which would maximize coverage, the railroad has attempted to convert the cause test into a rubber stamp which would justify coverage in every case. This is a misapplication of the cause test which leads to an implausible interpretation of the occurrence language. An implausible interpretation may not be given effect, even under a rule which favors indemnity where contract language is ambiguous.

## B. The Owens–Illinois Case.

Finally, the court must address the relevance of the *Owens–Illinois* decision, which the railroad cites as the most relevant precedent on the number of occurrences issue. The court is confident that *Owens–Illinois* does not undermine its conclu-

sion that the hearing loss claims did not arise out of a single occurrence. In *Owens–Illinois,* the court relied upon the reasonable expectations test to support its holding that the manufacture and sale of insulation containing asbestos constituted a single occurrence. The premise upon which the *Owens–Illinois* court concluded that the insured reasonably expected the asbestosis claims to be covered was stated as follows:

> If, as Aetna initially argued, each separate claim constituted one occurrence, then Aetna's limit of liability provisions [$20 million per occurrence] would be rendered meaningless as it strains the imagination to conceive of a single claim that would generate $20 million of damage.

*Owens–Illinois,* 597 F.Supp. at 1527. Precisely because the position taken by the insurers in the present case does not render the policies meaningless, the reasonable expectations test does not lead to the result which the railroad seeks, and the *Owens–Illinois* case does not dictate a single occurrence holding.

When the railroad first entered the insurance market, it apparently sought coverage for what has been described as "big bang" liability. The type of accident with which the railroad was concerned would be like the car accident in *Heary,* except that, because a train would be involved, and the train might be carrying toxic chemicals, and the train might wreck in a heavily populated area, the railroad's liability could be tremendous. The claims giving rise to this case do not initially appear to be the type of catastrophe against which the railroad intended to insure. Regardless of whether they are or not, the important fact, in light of *Owens–Illinois,* is that the policies continue to insure against a great number of possible liabilities whether the NIHL claims are held to arise out of a single occurrence or not. The concern expressed by the *Owens–Illinois* court—that a holding of multiple occurrences would render the insurance policy meaningless—is simply not present in this case. Absent a holding of single occurrence, the policies at issue remain vital, meaningful agreements. The catastrophic accident with which the railroad was apparently concerned when it entered the insurance market continues to be a risk against which the railroad is well-insured.

Ultimately, this crucial factual distinction between *Owens–Illinois* and this case undermines the railroad's reliance on *Owens–Illinois,* and the court is left to its own analysis with regard to the meaning of the occurrence language. Having found that the occurrence language is ambiguous, the court must determine whether the declaration sought by the railroad comports with a plausible interpretation of the language. For the reasons stated above, the court holds that the single occurrence interpretation is not plausible. The court will therefore deny the plaintiff's motion to the extent that it seeks a declaration that the underlying claims arose out of a single occurrence.

An appropriate order, reflecting the court's determinations with respect to each question before it, shall be entered this day.