SECOND DIVISION

November 29, 2005

No. 1-04-3524

NICOR, INC., an Illinois Corporation, ) Appeal from the 

and NORTHERN ILLINOIS GAS COMPANY, an ) Circuit Court of

Illinois corporation doing business as ) Cook County.

NICOR GAS COMPANY,   )

) 

Plaintiffs-Appellees, )

)

v. )

)

ASSOCIATED ELECTRIC AND GAS INSURANCE )

SERVICES LIMITED, et al., )

) 

Defendants, )

)

and )

)

CERTAIN UNDERWRITERS AT LLOYD’S )

OF LONDON and CERTAIN LONDON MARKET )

INSURANCE COMPANIES, ) Honorable 

) Lee Preston,

Defendants-Appellants. )    Judge Presiding.   

JUSTICE WOLFSON delivered the opinion of the court:

The $10 million question in this case is whether mercury spills during 17 years of insurance coverage were a single occurrence or separate occurrences.

Nicor, Inc., and Northern Illinois Gas Co., d/b/a Nicor Gas Co. (Nicor), seek coverage from their general liability insurers for costs associated with the investigation and cleanup of mercury in customers’ residences during a 17-year period.  The mercury contamination was the result of Nicor’s removal of mercury-containing gas meter regulators.  In 0.5% of the removals, mercury was spilled.  

The trial court entered partial summary judgment for Nicor, finding Nicor’s "systematic failure to consistently remove the mercury regulators in a safe manner resulted in a single ‘occurrence’ under [the policies]."  On appeal, the defendants (London Insurers) contend each of the spills that resulted in mercury contamination was a separate "occurrence" under the policies, requiring Nicor to pay separate self-insured retentions (SIR’s).  We reverse and remand.             

FACTS

Nicor supplies natural gas to residential and commercial properties throughout Northern Illinois and Chicago.  As part of its service, Nicor installs gas meters to measure the amount of natural gas being supplied to the properties.  The meters include a regulator that controls the flow of gas into a residence.  Prior to the mid-1950's, Nicor installed regulators inside customers’ homes.  The regulators contained a small amount (approximately 1.5 to 4 fluid ounces) of mercury.  Beginning in 1961, Nicor began using temperature-compensating or mechanical-relief meters that could be installed on the outside of customers’ homes.  Those meters did not contain mercury.

In 1961, Nicor began removing the mercury-containing regulators.  When service crews visited a home to perform maintenance or repair work, they would remove a mercury-containing meter from inside a residence and replace it with a temperature-compensating meter outside the residence.  Nicor used written materials and videotapes to train its employees in the proper removal procedures.  When removing the regulators from customers’ homes, Nicor’s technicians occasionally tilted or dropped the regulators and spilled the mercury.  

By early 2000, Nicor had received isolated claims of mercury contamination in the homes of some customers.  On September 5, 2000, the Illinois Attorney General and the state’s attorneys of Cook, DuPage, and Will counties filed a lawsuit against Nicor demanding that Nicor investigate the extent of mercury contamination in all potentially impacted homes and clean all homes where mercury contamination was detected above an established threshold.  

On September 12, 2000, the circuit court entered an agreed preliminary injunction in the attorney general’s action.  The court ordered Nicor to begin the identification, investigation, and cleanup of homes contaminated by mercury spills from regulators.  The order codified the removal procedures for regulators as well as the procedures to be followed in case of a spill during removal.  Nicor admits the order provided for the same general procedures for the removal of mercury-containing regulators as were set forth in Nicor’s Safety Program guidelines promulgated in 2000.  

Pursuant to the court’s order, Nicor inspected about 200,000 residences.  Of those inspected, approximately 1,070 homes tested positive for the presence of mercury at levels above those mandated by the court.  Those residences represented about 0.5% of all inspected residences.  Nicor incurred approximately $90 million in connection with the investigation and cleanup of the mercury contamination.  According to the appellants’ brief, mercury spills occurred in 195 homes during the policy periods relevant to this appeal.   

Nicor estimates there were approximately 155,554 indoor mercury-containing regulators in the system before 1961.  As of January 2001, 25,905 indoor mercury-containing regulators remained in the system.  On October 10, 2001, the court entered an order finding Nicor had complied with the terms of the September 12, 2000, order.  

Several customer class action lawsuits also were filed against Nicor and its contractors as a result of the mercury contamination.  The suits were consolidated into a single class action.  The class action was settled in October 2001.  The settlement incorporated monetary relief as well as the investigation and cleanup procedures that resolved the attorney general’s action.

The excess liability insurance policies at issue cover the period from 1961 through 1978.  The insuring agreements require London Insurers to indemnify Nicor for "all sums" Nicor becomes legally obligated to pay because of property damage caused by or growing out of an "occurrence."  There were two sets of policies covering the time period.  The policies issued between 1961 and November 1976 define an "occurrence" as:

"one happening or series of happenings, arising out of or due to one event taking place during the term of this contract."

The policies issued from November 1976 through 1978 define an "occurrence" as:

"(1) an accident, or 

(2) event or continuous or repeated exposure to conditions which result in bodily injury, personal injury, death or physical damage to or destruction of tangible property, including loss of use.  All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."      

The policies provide coverage in excess of a self-insured retention (SIR).  The amount of the SIR ranges from $100,000 to $250,000, according to the policy period.  Nicor is responsible for satisfying the SIR for losses paid as a consequence of a covered occurrence before London Insurers is required to indemnify Nicor for that occurrence.  The cost to Nicor to remediate any individual home rarely exceeded the per-occurrence SIR.  

On November 13, 2000, Nicor brought a complaint for declaratory judgment, breach of contract, and anticipatory breach of contract against its insurers.  Those of Nicor’s insurers who settled with Nicor or were dismissed are not parties to this appeal.  

In a pre-trial stipulation, the parties stipulated that "[m]ercury contamination found in the residences of Nicor’s customers was more likely than not due to the removal of mercury-containing regulators from inside the homes."  They further stipulated that at least one mercury spill occurred during each policy period that the London policies were in place.  

Nicor and London Insurers filed cross-motions for summary judgment on the issue of the number of occurrences.  For purposes of the motions, Nicor stipulated that the loss associated with each individual home contaminated by mercury did not exceed the applicable SIR of the particular policy.  In other words, if the trial court found each mercury spill was a separate occurrence, London Insurers would owe nothing. 

On September 1, 2004, the court found in favor of Nicor.  In its memorandum opinion and order, the court found Nicor’s improper removal of mercury regulators must be regarded as a single occurrence under the policies.  The court said:

"In this case, plaintiff Nicor’s inconsistent and unsafe conduct in removing the mercury containing regulators created harmful results.  These harmful results stemmed from Nicor’s failure to appropriately and carefully follow an acceptable procedure in removing the mercury regulators.  Although harm did not result every time a mercury regulator was removed from a home, such harm was consistently and routinely a result of Nicor’s failure to invoke proper procedures to safely remove the mercury regulators."  

Nicor and London Insurers subsequently stipulated to the remaining facts and issues necessary for the trial court to enter judgment in Nicor’s favor.  On October 25, 2004, a final judgment was entered against London Insurers in favor of Nicor in the amount of $10,281,703.46.      

DECISION

"Summary judgment is appropriate when there is no genuine issue of material fact and the moving party’s right to judgment is clear and free from doubt."  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995).  Our review of 
the trial court’s grant of partial summary judgment is 
de
 
novo
. 
 
Zekman v. Direct American Marketers, Inc.
, 182 Ill. 2d 359, 374, 695 N.E.2d 853 (1998).  The construction of the provisions of an insurance policy also is subject to 
de
 
novo
 review. 
 
Krusinski Construction Co. v. Northbrook Property & Casualty Insurance Co.
, 326 Ill. App. 3d 210, 218, 760 N.E.2d 530 (2001).  The determination of the scope of an insurance policy is a question of law appropriately decided in a motion for summary judgment.  
Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur
, 317 Ill. App. 3d 737, 749, 739 N.E.2d 1049 (2000)
.

Our primary objective in construing the language of an insurance policy is to ascertain and give effect to the intent of the parties to the contract.  We must "construe the policy as a whole, taking into account the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract."  
Crum & Forster Corp. v. Resolution Trust Corp.
, 156 Ill. 2d 384, 391, 620 N.E.2d 1073 (1993).  If the terms of the policy are clear and unambiguous, they must be given their plain and ordinary meaning.  
Gillen v. State Farm Mutual Automobile Insurance Co.
, 215 Ill. 2d 381, 393, 830 N.E.2d 575 (2005).  
If the terms are susceptible to more than one meaning, they are ambiguous and will be construed strictly against the insurer.  
American States Insurance Co. v. Koloms
, 177 Ill. 2d 473, 479, 687 N.E.2d 72 (1997).  Provisions that limit or exclude coverage will be interpreted liberally in favor of the insured.  
Koloms
, 177 Ill. 2d at 479. 

The issue is whether, under the insurance policies, Nicor’s liability resulted from a single "occurrence" or multiple separate "occurrences."  Illinois follows the majority of jurisdictions in using the "cause" analysis to determine the number of occurrences.  
Aetna Casualty & Surety Co. v. O’Rourke
, 333 Ill. App. 3d 871, 881, 776 N.E.2d 588 (2002).  The court looks to the underlying cause or causes of the damage rather than to the number of individual claims or injuries. 
 
O’Rourke
, 333 Ill. App. 3d at 881.  
"[T]he court’s inquiry is whether there was one proximate, uninterrupted and continuing cause which resulted in all of the injuries and damage."  
United States Gypsum Co. v. Admiral Insurance Co.
, 268 Ill. App. 3d 598, 650, 643 N.E.2d 1226 (1994), quoting 
Owens-Illinois, Inc. v. Aetna Casualty & Surety Co.
, 597 F. Supp. 1515, 1527 (D.D.C. 1984). 

The parties offer different definitions of the "cause" of the damages in this case.  London Insurers say the mercury spills resulted from multiple, separate causes, depending on the independent conduct of the particular Nicor servicemen and the unique circumstances of each house.  The insurers point to the fact that 99.5% of the removals occurred without incident, and, according to a Nicor employee, it was a "rare event" that mercury would be spilled in the course of removing a regulator.  

The reasons for spills were varied.  They included carelessness or negligence by employees, accidental tripping or stumbling, and the particular circumstances presented by each customer’s home.  For example, appliances, cabinets, or shelves might be located close to the regulator or built around the regulator.  The spills occurred over the course of 20 years, 17 of them coverage periods.  As part of the court order settling the attorney general's litigation, Nicor agreed to continue removing the regulators using essentially the same procedures it had been using.      

Nicor says the damages arose from a single occurrence under the policies.  Nicor defines the cause as the recurring, system-wide removal of the mercury-containing regulators "in a manner resulting in a spill."  It relies on a number of cases which, Nicor says, support a finding of a single occurrence where injuries are system-wide and recurrent.  See 
Household Manufacturing, Inc. v. Liberty Mutual Insurance Co.
, No. 85 C 8519 (N.D. Ill. Feb. 10, 1987); 
U.S. Gypsum
, 268 Ill. App. 3d 598; 
O’Rourke
, 333 Ill. App. 3d 871
.  

In 
Household
, the plaintiff manufactured and sold a plumbing system to plumbing contractors, who then installed the system for residential use.  
Although the plumbing system consisted of several separate components, it was designed, marketed, sold, and warranted as a single, unified plumbing system.  
The court rejected the insurer’s attempt to separate damage claims based on the discrete component complained to be defective.  
Household
, No. 85 C 8519, slip op. at 4-5.  Moreover, the court found the insurance policy’s plural use of “conditions” in its definition of “occurrence” (i.e., “continued or repeated exposure to conditions”) “strongly supports the inference that more than one specific physical defect can give rise to a single occurrence.”  
Household
, No. 85 C 8519, slip op. at 4-5.  Thus, the act that gave rise to plaintiff’s liability in more than 60 lawsuits was its continuous and repeated sale of a defective product, which constituted a single occurrence.  
Household
, No. 85 C 8519, slip op. at 4.

Similarly, the court in 
U.S. Gypsum
 found that Gypsum’s continuing process of manufacturing and selling asbestos-containing products constituted one occurrence, even though approximately 250 claims were filed against Gypsum.  268 Ill. App. 3d at 648.  The language of the insurance policies provided damage that resulted from “ ‘substantially the same condition’ ” or out of a “ ‘common defect, condition or cause’ ” constituted a single occurrence.  
U.S. Gypsum
, 268 Ill. App. 3d at 649.  The court likened the damages to those in which an insured’s conduct is repetitive and results in a number of similar injuries.  
U.S. Gypsum
, 268 Ill. App. 3d at 651, citing 
Wilkinson & Son, Inc. v. Providence Washington Insurance Co.
, 124 N.J. Super. 466, 307 A.2d 639 (1973) (single occurrence where one employee damaged 34 apartments in a two-day period), and 
Michaels v. Mutual Marine Office, Inc.
, 472 F. Supp. 26 (S.D.N.Y. 1979) (the negligent unloading of a ship resulting in more than 200 holes to the ship’s surface during a nine-day period was a single occurrence). 

The court noted other courts generally hold that where the “continuous production and sale of an intrinsically harmful product results in similar kinds of injury or property damage, then all such injury or property damage results from a common occurrence.”  
U.S. Gypsum
, 268 Ill. App. 3d at 650. 

Relying on 
U.S. Gypsum
, the court in 
O’Rourke
 found O’Rourke’s continued solicitation of its satellite system constituted one occurrence, giving rise to all of plaintiffs’ claims.  
O’Rourke
, 333 Ill. App. 3d at 882.  Because each plaintiff’s settled claim fell below the policy retained limit, a finding of multiple occurrences would make O’Rourke liable for all damages awards, and Aetna for none.  
O’Rourke
, 333 Ill. App. 3d at 882.  The court found that this would, in effect, deny O’Rourke coverage, and make Aetna’s policy illusory.  
O’Rourke
, 333 Ill. App. 3d at 882. 

We believe the cases cited by Nicor in favor of finding a single occurrence are distinguishable and in fact support the interpretation offered by the insurers.  In 
U.S. Gypsum
, the court rejected the insurer’s argument that each installation of asbestos-containing products in a building constituted a separate occurrence.  The reason for that rejection has an impact in this case.  The court took pains to distinguish the manufacture and sale of defective products from the installation of such products:

"It would be unwise and without support in case law to determine that each installation of the asbestos-containing products constituted a separate occurrence when Gypsum’s liability is predicated on its involvement in the manufacture and sale of the products rather than the installation of the products."  
U.S. Gypsum
, 268 Ill. App. 3d at 651.

We read the court
 as saying that had Gypsum’s liability been predicated on the installation of the defective products rather than their manufacture and sale, the court would have found each installation constituted a separate occurrence.  
Both parties agree we are not deciding a case involving the manufacture and sale of defective products, as in 
U.S. Gypsum
, or the sale of products, as in 
Household
 and 
O’Rourke
.  No mercury was spilled, and no damages occurred, until the mercury-containing regulators were removed.  

Nicor has taken the position that the single event or occurrence it relies on is removal of the regulators in a manner that resulted in mercury spills.  The removal of a defective product is more similar to the installation of a product than to the manufacture and sale of products.  To say the manner in which the removals occurred over a period of 20 years is "one event" or a single occurrence defies common sense.  

Nicor’s argument is similar to that advanced by the insured in 
Norfolk & Western Ry. Co. v. Accident & Casualty Insurance Co. of Winterthur
, 796 F. Supp. 929, 932 (W.D. Va. 1992).  The case involved railroad employees’ claims of hearing loss from excess noise.  The railroad contended its negligence in failing to protect its employees was the single cause of the injuries.  
Norfolk
, 796 F. Supp. at 937.  Calling the railroad’s argument "nonsensical," the court found the argument removed any limit from the category of things which might be found to be a cause.  "By moving the analysis of cause to a level sufficiently general to support an interpretation which would maximize coverage, the railroad has attempted to convert the cause test into a rubber stamp which would justify coverage in every case."  
Norfolk
, 796 F. Supp. at 937.  

We have held that where each asserted loss is the result of a separate and independent intervening human act, either negligent or intentional, each loss arises from a separate occurrence.  See 
Illinois Central R.R. Co. v. Accident & Casualty Co. of Winterthur
, 317 Ill. App. 3d 737, 748-49, 739 N.E.2d 1049 (2000) (discriminatory hiring claims were separate occurrences where each hiring decision involved a "human agency committing a specific act," and there was no well-defined policy with a discriminatory impact); 
Roman Catholic Diocese of Joliet, Inc. v. Interstate Fire Insurance Co.
, 292 Ill. App. 3d 447, 455, 685 N.E.2d 932 (1997) (in lawsuit alleging sexual abuse of a minor by a priest, 
each repeated "exposure" of the minor to the negligently supervised priest in each of the policy periods constituted a separate occurrence); 
Illinois National Insurance Co. v. Szczepkowicz
, 185 Ill. App. 3d 1091, 1096, 542 N.E.2d 90 (1989) (in a collision involving three vehicles, claims arose out of two separate accidents because conditions resulting in each collision were not "substantially the same.") 
 

Courts also have found separate occurrences where each act increased the insured’s exposure to liability.  See 
Village of Camp Point v. Continental Casualty Co.
, 219 Ill. App. 3d 86, 103, 578 N.E.2d 1363 (1991) (each time the attorney rendered legal services knowing his activities violated a statute was a separate cause of an injury);
 
Michigan Chemical Corp. v. American Home Assurance Co.
, 728 F.2d 374, 383 (6th Cir. 1984) (each shipment of contaminated livestock feed constituted a separate "occurrence" 
because the individual shipments of the substance, rather than the contamination itself, created the exposure to liability); 
Mason v. Home Insurance Co. of Illinois
, 177 Ill. App. 3d 454, 460, 532 N.E.2d 526 (1988) (each sale and consumption of tainted food constituted a separate occurrence under the policy, where the insured incurred liability each time it served its patrons contaminated food.) 

Here, Nicor incurred liability each time mercury was spilled from a regulator.  
Rather than attributing the cause of the damage to a system-wide failure by Nicor to remove the regulators safely, we find the spills occurred in an isolated number of cases as a result of an individual serviceman’s actions or the particular circumstances in each residence.  

 Nicor advances other arguments in support of its contention that the systematic removal of the regulators in a manner resulting in mercury spills was one occurrence, none of which we find persuasive.  

Nicor contends that by framing each spill as the result of a separate and independent act, London Insurers are attempting to evade the cause test and are asking this court to look at the more distant “cause of the cause.”  For example, Nicor contends that London Insurers ask the court to separate occurrences based on whether the spill was the result of negligence, as opposed to an accident, and whether the spill was caused by the tipping of a regulator when being removed from its position, as opposed to spilling while the regulator was being carried out of the home.  We disagree with Nicor’s contention.  As we have stated, we believe it is more logical to say the damages were caused by each individual removal than by the general, system-wide removal in a manner resulting in spills over the course of 20 years.  

Nicor contends a finding of multiple occurrences would render its insurance coverage illusory, as the court held in 
O’Rourke
, 333 Ill. App. 3d at 882.  Courts have found insurance policies were rendered meaningless where it was unlikely that a single claim would generate enough damage to meet a large self-insurance retention.  See 
Owens-Illinois, Inc. v. Aetna Casualty & Surety Co.
, 597 F. Supp. 1515, 1527 (D.D.C. 1984)
; 
O’Rourke
, 333 Ill. App. 3d at 871.  
Courts often employ the reasonable expectation test to determine whether an insurance policy is illusory.  See, e.g., 
Norfolk
, 796 F. Supp. at 938; 
Owens-Illinois, Inc.
, 597 F. Supp. at 1527; 
Michael Nicholas, Inc. v. Royal Insurance Co. of America
, 321 Ill. App. 3d 909, 915, 748 N.E.2d 786 (2001).  The policy need not provide coverage against all possible liabilities; if it provides coverage against some, the policy is not illusory.  
Norfolk
, 796 F. Supp. at 938.

In 
Norfolk
, the court held if the claims arose out of separate occurrences, the insurance policy was not rendered meaningless because there were other possible liabilities covered by the policy.  
Norfolk
, 796 F. Supp. at 938.
 
 
The claims did not appear to be the type of "big bang" catastrophe the railroad intended to insure.  
Norfolk
, 796 F. Supp. at 938.  The railroad sought insurance coverage for an incident where a train spilled toxic chemicals in several places in a heavily populated area.  
Norfolk
, 796 F. Supp. at 938.  The court found the incidents of spill were separate occurrences.  We believe the policy in this case is similar to that in 
Norfolk
.

It is easy to envision a scenario where the policies at issue would have provided coverage to Nicor.  For example, had there been a single spill of toxic chemicals resulting in widespread damage to property, the policies would have provided coverage.  

Next, Nicor contends 
a stipulation between the parties amounted to a concession by London Insurers.  At trial, Nicor and London Insurers, along with several other party insurers, entered a stipulation regarding the testimony of expert witness Philip Cali.  In lieu of calling this witness, the parties agreed that: (1) “[m]ercury contamination found in the residences of Nicor’s customers was more likely than not due to the removal of mercury-containing regulators from inside the homes,” and (2) “the earliest date of contamination as being more likely than not the date the regulator was removed.”

Nicor contends the underlying actions brought by the Illinois Attorney General and the consolidated class established the cause as a single occurrence.  Nicor relies on the following evidence: each action alleged a common and collective injury; the Illinois Attorney General did not allege individual spills to be isolated incidents; the Illinois Attorney General and the consolidated class actions sought to require Nicor to investigate and perform remediation across its entire system; and each action resulted in a comprehensive order, on behalf of all affected residents.  Nicor contends that, because the underlying actions treated the cause as a single occurrence, this court must find the same. 

A similar argument was rejected in 
Illinois Central
, where the insured contended the federal court’s finding in the underlying litigation required the appellate court to find a single occurrence.  317 Ill. App. 3d at 749-50.  In rejecting this argument, the court distinguished the purpose of the underlying litigation from the current task of determining the impact of the damage in terms of number of occurrences.  
Illinois Central
, 317 Ill. App. 3d at 749-50.  Similarly, the purpose of the attorney general and consolidated class actions here was not to determine the number of occurrences.  

Finally, Nicor contends a finding of multiple occurrences would violate Illinois public policy.  Determination of whether an insurance contract is contrary to public policy depends on the facts and circumstances of each case, as well as the language of the contract.  
Braye v. Archer-Daniels-Midland Co.
, 175 Ill. 2d 201, 215-16, 676 N.E.2d 1295 (1997); 
American Country Insurance Co. v. Cline
, 309 Ill. App. 3d 501, 506, 722 N.E.2d 755 (1999).  Courts prefer construing a contract so that the agreement is enforceable rather than void.  
Braye
, 175 Ill. 2d at 217.  In 
Braye
, the court presumed parties to the contract knew the law in existence at the time they executed the contract and read the contract language so as not to violate public policy.  175 Ill. 2d at 217.  The court in 
American Country
 endorsed an insurance policy that contained an exclusion provision where the insureds were sophisticated businesses that, assumedly, would negotiate coverage prior to execution of the contract.  309 Ill. App. 3d at 512.  Nicor was not an unsophisticated individual consumer when it purchased the insurance policies.  We do not find any violation of public policy stemming from our reading of the insurance contracts.    

CONCLUSION

We reverse the trial court’s order entering summary judgment for Nicor and remand for proceedings consistent with our conclusion that each mercury spill was a separate occurrence. Reversed and remanded with directions.

GARCIA, P.J., and SOUTH, J., concur.