No. 1-22-1160

2023 IL App (1st) 221160

SECOND DIVISION
December 19, 2023

No. 1-22-1160

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE NATIONAL FIRE INSURANCE COMPANY OF HARTFORD and CONTINENTAL INSURANCE COMPANY, | ) ) ) ) | Appeal from the Circuit Court of Cook County, Illinois, County Department, Chancery Division |
| Plaintiffs-Appellees, | ) ) | |
| v. | ) ) | No. 2020 CH 06897 |
| VISUAL PAK COMPANY, INC. and LUIS SANCHEZ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Hon. Thaddeus L. Wilson, Judge Presiding. |
| Defendants-Appellants. | ) ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1    In this insurance coverage dispute, plaintiffs National Fire Insurance Company of

Hartford and Continental Insurance Company filed suit for a declaration that they did not owe a

duty to defend or indemnify defendant Visual Pak Company in an underlying lawsuit. Plaintiffs

moved for judgment on the pleadings, claiming that various exclusions in their policies barred

coverage in that underlying suit. The trial court initially disagreed, finding that the insurers were

estopped from asserting defenses within the policy. On reconsideration, the trial court reversed

itself, ruling that a particular exclusion in the policy barred coverage, and because plaintiff had no duty to defend, the question of estoppel was moot.

¶ 2      We affirm the circuit court's judgment. The trial court correctly reconsidered its initial, erroneous ruling and reversed course. Plaintiffs owed Visual Pak no duty to defend under the terms of their policies. In reaching this conclusion, we are mindful of a recent decision from the United States Court of Appeals for the Seventh Circuit, which reached the opposite conclusion under Illinois law. Though we do not do so lightly, we believe that this federal decision was wrongly decided and decline to follow it.

¶ 3      And once the determination is made that the insurer owed no duty to defend, estoppel is inapplicable. Estoppel will prevent an insurer in certain circumstances from asserting various defenses to coverage, but it cannot be used to convert a policy that does not provide coverage into one that does.

¶ 4                              BACKGROUND

¶ 5      Like any case involving an alleged duty to defend, this case begins with an underlying lawsuit for which a defendant seeks defense from its insurer. So the story, so to speak, begins with that underlying suit.

¶ 6                    I. The Biometric Information Privacy Act Lawsuit

¶ 7      A staffing and temporary employment agency named Elite Staffing provided staffing services to Visual Pak. When Elite staffed an employee at Visual Pak, the employee was required to enroll in an employee database using a fingerprint scan. Visual Pak and Elite used the employee database to "monitor the time worked by each of the hourly workers at Visual Pak." The data collected by Visual Pak was transferred to Elite for payroll purposes.

¶ 8      Luis Sanchez was one such employee; he worked for Visual Pak (via Elite Staffing) as a

warehouse worker from February through April 2016. Sanchez was required to scan his fingerprint at the beginning and end of each workday. According to the amended complaint, Visual Pak "collected, stored, used, or disseminated" Sanchez's fingerprints without his consent and without any policies in place regarding the retention and deletion of his fingerprints from the database. Visual Pak failed to inform him of how his biometric information would be used. Nor did Visual Pak provide him with a release for the use of his biometric information.

¶ 9 This, Sanchez alleged, was a violation of the Biometric Information Privacy Act, or "BIPA." See 740 ILCS 14/15 (West 2016). He filed this BIPA suit on February 28, 2018.

¶ 10 In that suit, Sanchez sought a declaratory judgment that Visual Pak violated BIPA. The amended complaint sought certification of a class. Sanchez also prayed for injunctive and equitable relief requiring Visual Pak's compliance with BIPA. And he sought damages for the willful violation of BIPA or, in the alternative, statutory damages and attorney fees. See *id.* § 20.

¶ 11                              II. Visual Pak's Tender of BIPA Suit for Defense

¶ 12 Regarding what happened after the filing of the BIPA lawsuit, we draw our facts from the counterclaim filed here and accept those allegations as true. See *Pekin Insurance Co. v. Wilson*, 237 Ill. 2d 446, 455 (2010) (in considering judgment on pleadings, well-pleaded allegations in non-movant's pleadings are accepted as true).

¶ 13 At all relevant times, Visual Pak had three different insurance policies in place. All three were affiliates of CNA. Two of them (National Fire Insurance and Continental Insurance) are plaintiffs here. They provided general liability insurance to Visual Pak—National Fire, a commercial general liability policy, and Continental Insurance, an excess/umbrella policy of general liability coverage. Through the remainder of our discussion, for ease of reference and to distinguish them from the third, non-party insurer, we will follow the lead of the parties in their

briefs and refer to National Fire and Continental Insurance collectively as the "CNA plaintiffs."

¶ 14    Visual Pak's third policy was provided by a third CNA affiliate, Continental Casualty Insurance Company (Continental Casualty). The Continental Casualty policy was not a general liability policy but an employment practices liability policy.

¶ 15    There is no dispute that Visual Pak tendered defense of the BIPA action to this third insurer, Continental Casualty, 10 days after the BIPA suit was filed—March 8, 2018. Subject to a reservation of rights, Continental Casualty provided defense and indemnification to Visual Pak through the conclusion of the BIPA suit based on its employment practices liability coverage.

¶ 16    Parenthetically, we note that there is very much a dispute over whether Visual Pak's tender of that suit to Continental Casualty constituted a tender to the CNA plaintiffs, as well. The CNA plaintiffs insist that they were not tendered the defense until two years later, in April 2020. But as we noted above, given the posture in which we find this matter, we will assume the truth of the allegations in the counterclaim filed against the CNA plaintiffs. See *id.* The counterclaim alleges that the CNA plaintiffs were tendered defense of the BIPA action on March 8, 2018; that is the fact we will assume to be true.

¶ 17    In any event, with Continental Casualty providing the defense of Visual Pak, the BIPA suit proceeded through attempts at settlement, including multiple mediations. In April 2020, the CNA plaintiffs acknowledged tender of the defense; in May, they denied coverage of their general liability and excess/umbrella coverages.

¶ 18    Sometime in 2021, the circuit court granted preliminary approval for a class action. Visual Pak estimated that the class of former employees whose BIPA rights were allegedly violated numbered over 13,000 people.

¶ 19    As best we can understand from the complaint, which is a bit contradictory in its

description of the settlement, the BIPA suit settled for $19.5 million. Visual Pak agreed to pay $3.5 million in a confession of judgment and assigned its claims against the CNA plaintiffs to Sanchez and the plaintiff class in the BIPA action. Technically, then, in this declaratory judgment action regarding insurance coverage, Sanchez is the defendant, not Visual Pak, and we will refer to him and not Visual Pak in our analysis where necessary.

¶ 20                                III. Declaratory Judgment Action

¶ 21     The CNA plaintiffs filed this action, seeking a declaration that the CNA plaintiffs owed no duty to defend or indemnify Value Pak in the BIPA action. Sanchez filed a counterclaim for declaratory judgment, claiming that the CNA plaintiffs owed Value Pak duties to defend and indemnify.

¶ 22     The CNA plaintiffs moved for judgment on the pleadings. In addition to arguing that Visual Pak was entitled to coverage under the terms of the policies, Sanchez argued that the CNA plaintiffs were estopped from asserting a denial of coverage, given their two-year delay in responding to Visual Pak's tender of coverage and their belated filing of this declaratory judgment action.

¶ 23     The circuit court was initially moved by Sanchez's argument. The court ruled that there was a "question of fact" as to whether Visual Pak was entitled to coverage and a "question of fact" as to whether the CNA plaintiffs were estopped from asserting a denial of coverage, given the delay in their actions.

¶ 24     The CNA plaintiffs moved for reconsideration, arguing that estoppel did not apply here, because the plain language of the policies showed that the BIPA action fell within an exclusion, and the doctrine of estoppel only intervenes to prevent an insurer from raising certain defenses to coverage. In other words, estoppel should only be considered if the court first determines that a

duty to defend exists; if it does not, the matter should come to an end in favor of the insurer.

¶ 25    In a second written order, the circuit court granted the motion to reconsider and granted the CNA plaintiffs' motion for judgment on the pleadings. The circuit court agreed with the CNA plaintiffs that no duty to defend or indemnify existed under the policies, and the question of estoppel was thus inapplicable. This appeal followed.

¶ 26                                ANALYSIS

¶ 27    A motion for judgment on the pleadings, for all practical purposes, is akin to a motion for summary judgment limited to the pleadings. *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 52; see 735 ILCS 5/2-615(e) (West 2020). The court considers only those facts apparent from the face of the pleadings, along with judicial admissions and matters subject to judicial notice. *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 52. As already noted, we assume the truth of all well-pleaded allegations set forth in the non-movant's pleadings—here, the counterclaim filed by Sanchez. *Wilson*, 237 Ill. 2d at 455. Judgment on the pleadings is proper, as in summary judgment, when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.* Our review is *de novo*. *Id.*

¶ 28    There are two questions before us. First, whether the CNA plaintiffs owed a duty under the policies to defend and indemnify Value Pak in the BIPA suit. And second, whether the doctrine of estoppel plays a role in the outcome.

¶ 29                                    I

¶ 30    We first consider whether the CNA plaintiffs' policies required coverage for Value Pak. We begin with the duty to defend, which is broader than the duty to indemnify. *Id.* at 456. If there is no duty to defend, there is obviously no duty of indemnification, either. *Id.*

¶ 31    In determining a duty to defend, the court compares the allegations in the underlying

complaint with the relevant portions of the insurance policy. *Id.* at 455. If the facts alleged in the underlying complaint even *potentially* fall within the policy's coverage, the insurer must defend the insured in the underlying lawsuit. *Id.*

¶ 32     In construing an insurance policy, we strive to give effect to the intention of the parties as evidenced by the policy's language. *Id.* If the language is clear and unambiguous, we give the words their plain and ordinary meaning. *Id.* at 455-56. If the language is susceptible to more than one meaning, we resolve the ambiguity in favor of the insured. *Id.* at 456. We construe the policy as a whole and consider the type of insurance purchased, the nature of the risks involved, and the overall purpose of the contract. *Id.* We interpret the language from the standpoint of the insured. See *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010).

¶ 33     We start with a review of the amended complaint in the underlying BIPA suit. The amended complaint alleges that, in obtaining and sharing its workers' fingerprint scans, Visual Pak violated BIPA in that it failed to do the following:

> "a. Properly inform Plaintiffs and others similarly situated in writing of the specific purpose and length of time for which their fingerprints were being collected, stored, disseminated and used, as required by BIPA;
>
> b. Provide a publicly available retention schedule and guidelines for permanently destroying Plaintiffs' and other similarly-situated individuals' fingerprints, as required by BIPA; and
>
> c. Receive a written release from Plaintiffs and others similarly situated to collect, store, disseminate or otherwise use their fingerprints, as required by BIPA."

¶ 34     The amended complaint contains three counts that allege these violations of BIPA generally and section 15 specifically. See 740 ILCS 14/15 (West 2016).

¶ 35    We now compare those allegations to the policy language. Among other things, the policy covers liability for "personal and advertising injury," defined as an "injury, including consequential bodily injury, arising out of one or more of the following offenses:

> "a. False arrest, detention or imprisonment;
>
> b. Malicious prosecution;
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> e. *Oral or written publication, in any manner, of material that violates a person's right of privacy*;
>
> f. The use of another's advertising idea in your advertisement; or
>
> g. Infringing upon another's copyright, trade dress or slogan in your advertisement." (Emphasis added.)

¶ 36    Sanchez argues that Visual Pak's liability for a violation of BIPA would constitute liability described under subsection (e) above for "oral or written publication, in any manner, of material that violates a person's right of privacy." We need not spend much time on this analysis, for our supreme court has conclusively resolved this question.

¶ 37    In *West Bend Mutual Insurance Co. v. Krishna Schaumburg Tan, Inc.*, 2021 IL 125978, the supreme court considered whether the insurer had a duty to defend an insured in an underlying BIPA suit. There, the policy similarly provided liability coverage for "an injury, other

than bodily injury, arising out of an oral or written publication of material that violates a person's right of privacy." *Id.* ¶ 49. The court found that the underlying BIPA complaint pleaded an injury in that the underlying plaintiffs pleaded emotional and mental injury stemming from the sharing of biometric information. *Id.* The court likewise found that the dissemination of one's biometric information constituted "publication" under the policy. *Id.* ¶ 43.

¶ 38 The court then found that the unauthorized sharing of one's biometric information constituted "publication of material that violates a person's right of privacy." *Id.* ¶¶ 36, 45-46. The court reasoned that the right of privacy includes the protection of two distinct rights— "seclusion and secrecy." *Id.* ¶ 45. "Courts define the right to secrecy as the right to keep certain information confidential," while "[c]ourts define the right to seclusion as the right to be left alone and protecting a person from another's prying into their physical boundaries or affairs." *Id.* The court found that the sharing of one's biometric information constituted the violation of the "secrecy interest—here, the right of an individual to keep his or her personal identifying information like fingerprints secret." *Id.* ¶ 46. Thus, the underlying BIPA suit fell within the scope of coverage.

¶ 39 Here, the underlying BIPA complaint alleges that Visual Pak "violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA." It also alleges that Visual Pak's unauthorized retention and sharing of biometric information "have raised a material risk that Plaintiff's and the Class's biometric data will be unlawfully accessed by third parties."

¶ 40 So there is no question, nor do the CNA plaintiffs challenge, that a defense of the underlying BIPA suit falls within the coverage language of the policies. The controversy here involves the policy's exclusions, on which the CNA plaintiffs rely to claim they owed no duty to

defend Visual Pak in the underlying BIPA action. We move to that analysis next.

¶ 41                                                    II

¶ 42     The CNA plaintiffs rely on three different exclusions in the policy. We start with an exclusion that will bear resemblance to the exclusion at issue in *West Bend*—which we will call the "violation-of-law exclusion"—but which contains a difference in language that many courts have found to be sufficiently material that *West Bend* is not directly controlling.

¶ 43     Indeed, until recently, the interpretation of the identical violation-of-law exclusion at issue before us had divided the courts—courts that consisted exclusively of federal district courts applying Illinois law. The majority of decisions, considering the same policy language as before us, concluded that the defense of a BIPA lawsuit was *not* excluded from coverage under the violation-of-law exclusion. See, *e.g.*, *Thermoflex Waukegan, LLC v. Mitsui Sumitomo Insurance USA, Inc.*, No. 21 C 788, 2023 WL 319235, at *5-*7 (N.D. Ill. Jan. 19, 2023); *Citizens Insurance Co. of America v. Highland Baking Co.*, No. 20-cv-04997, 2022 WL 1210709, at *1 (N.D. Ill. Mar. 29, 2022); *Citizens Insurance Co. of America v. Thermoflex Waukegan, LLC*, 588 F. Supp. 3d 845, 853-54 (N.D. Ill. 2022). Other cases, looking at the same language, found that the violation-of-law exclusion did, in fact, exclude coverage.

¶ 44     A few months ago, the United States Court of Appeals for the Seventh Circuit weighed in, holding that nearly identical exclusion language as in our case did *not* preclude defense of an underlying BIPA lawsuit; the insurer owed a duty to defend. See *Citizens Insurance Co. of America v. Wynndalco Enterprises, LLC*, 70 F.4th 987, 997 (7th Cir. 2023). That decision, of course, abrogated the federal district court decisions that found the violation-of-law exclusion applicable. See *Continental Western Insurance Co. v. Cheese Merchants of America, LLC*, 631 F. Supp. 3d 503 (N.D. Ill. 2022), *abrogated by Wynndalco*, 70 F.4th 987; *State Auto Property &*

*Casualty Insurance Co. v. Fruit Fusion, Inc.*, 631 F. Supp. 3d 638, 645 (S.D. Ill. 2022), *abrogated by Wynndalco*, 70 F.4th 987.

¶ 45    But we are obviously not bound by a federal court's interpretation of Illinois law, be it a decision from a district court or a federal appellate court. See *Travelers Insurance Co. v. Eljer Manufacturing, Inc.*, 197 Ill. 2d 278, 302 (2001). So we will consider all the case law, even if some of those decisions, in some sense, are no longer "good law" on the subject, because from our perspective as an Illinois appellate court, we are bound by none of these decisions and are open to persuasion by any of them.

¶ 46                                      A

¶ 47    In determining whether the violation-of-law exclusion bars coverage here, our starting point must be *West Bend*, 2021 IL 125978, which considered whether a similar violation-of-law exclusion barred coverage of an underlying BIPA action. As already noted, the supreme court found that the coverage language in that policy included coverage for liability arising under BIPA claims. The court then turned to the violation-of-law exclusion in that policy, which read as follows:

> " 'This insurance does not apply to:
>
> ***
>
> "Bodily injury", "property damage", "personal injury" or "advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:
>
> > (1) The Telephone Consumer Protection Act (TCPA) [(47 U.S.C. § 227 (2018))], including any amendment of or addition to such law; or
> >
> > (2) The CAN-SPAM Act of 2003 [(15 U.S.C. § 7701 (Supp. III 2004))],

including any amendment of or addition to such law; or

(3) Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.' " *Id.* ¶ 9.

¶ 48    Because a violation of BIPA was not explicitly listed, the question in *West Bend* was whether a lawsuit alleging a BIPA violation fell within the general catch-all language in subsection (3). The court applied the interpretive doctrine of *ejusdem generis*, which provides that " 'where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are *** to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.' " *Id.* ¶ 57 (quoting Black's Law Dictionary 517 (6th ed. 1990)).

¶ 49    The court first pointed to the title of the exclusion, " 'Violation of Statutes that Govern E-Mails, Fax, Phone Calls *or Other Methods* of Sending Material or Information.' " (Emphasis in original.) *Id.* ¶ 58. The court noted that "all the items listed in the title are methods of communication." *Id.* Likewise, the two statutes explicitly listed in the exclusion were statutes that regulated methods of communication; the Telephone Consumer Protection Act of 1991 (TCPA) regulates the sending of unsolicited telephone calls and faxes, while the CAN-SPAM Act of 2003 (CAN-SPAM Act) governs unsolicited e-mails. *West Bend*, 2021 IL 125978, ¶ 58. Thus, under the doctrine of *ejusdem generis*, the general catch-all provision would apply only to other statutes that likewise regulate modes of communication. *Id.*

¶ 50    BIPA, "on the other hand, does not regulate methods of communication but regulates the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." *Id.* ¶ 55. Thus, said the court, "since [BIPA] is not a statute of the same kind as

the TCPA and the CAN-SPAM Act and since [BIPA] does not regulate methods of communication, the violation of statutes exclusion does not apply to [BIPA claims]." *Id.* ¶ 58.

¶ 51     The court then added this: "Moreover, to the extent that the 'other than' language in West Bend's policies may be viewed as ambiguous, it must be construed in favor of finding coverage for the insured." *Id.* ¶ 59. The exclusion thus did not apply, and West Bend owed its insured a duty to defend the underlying BIPA lawsuit.

¶ 52     We turn now to the exclusion in our policy, which we print here in full:

> "2. Exclusions. This insurance does not apply to:
>
> ***
>
> p. Recording And Distribution Of Material Or Information In Violation Of Law
>
> Personal and advertising injury arising directly or indirectly out of any action or omission that violates or is alleged to violate:
>
> > (1) The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;
> >
> > (2) The CAN-SPAM Act of 2003, including any amendment of or addition to such law;
> >
> > (3) The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transactions Act (FACTA); or
> >
> > (4) Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses,

13

prohibits, or limits *the printing, dissemination*, *disposal*, *collecting*, *recording*, *sending*, *transmitting*, *communicating or distribution of material or information.*" (Emphasis added.)

¶ 53    As BIPA is obviously not one of the statutes identified in subsections (1) through (3) of the exclusion, the CNA plaintiffs argue that a lawsuit alleging a violation of BIPA falls within the catchall exclusion of subsection (4) for any other statute, not previously identified in the exclusion, that governs "the *** dissemination, disposal, collecting, recording, sending, transmitting, communicating, or distribution of material or information."

¶ 54    We begin with two essential observations. First, the catchall exclusion here is broader than that in *West Bend*, which merely described a statute " 'that prohibits or limits the sending, transmitting, communicating or distribution of material or information.' " *Id.* ¶ 9. Some of the different verbs used in our exclusion are synonyms of the language in *West Bend*— "disseminating," for example, does not add much—but "disposal, collecting, [and] recording" undoubtedly broaden the exclusion at issue here.

¶ 55    And second, if we merely isolated this catchall language, it is simply impossible to deny that it describes BIPA. BIPA regulates the collection, dissemination, and disposal of one's biometric identifiers and information. See *Rosenbach v. Six Flags Entertainment Corp.*, 2019 IL 123186, ¶ 20 (BIPA "imposes on private entities *** various obligations regarding the collection, retention, disclosure, and destruction of biometric identifiers and biometric information."); 740 ILCS 14/15(b), (d) (West 2014) ("[n]o private entity may collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifier or biometric information" absent disclosure and consent; "[n]o private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or

14

otherwise disseminate a person's or a customer's biometric identifier or biometric information" absent disclosure and consent).

¶ 56    Indeed, even the Seventh Circuit, which for different reasons found this exclusion inapplicable to BIPA actions, conceded that "[t]here is no dispute that a literal, plain-text reading of the catch-all provision would include BIPA violations." *Wynndalco*, 70 F.4th at 997. We are aware of no reported decision that has found otherwise.

¶ 57    Because our provision contains materially different language than the catchall provision in *West Bend*, and because the language of our catchall provision clearly encompasses a violation of BIPA, we are tempted to stop there and find that the exclusion bars coverage. The supreme court in *West Bend* did not stop there, however, and given the controversy over this provision, we will continue with our analysis, following the lead of our supreme court and invoking the *ejusdem generis* canon.

¶ 58    The interpretive canon *ejusdem generis*, which literally means "of the same kind," seeks to identify a common theme among a list of items, a theme that would provide a limitation on the more general, catchall language that follows that list. See *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) ("*ejusdem generis* *** attribute[s] to the last item *** the same characteristic of discreteness shared by all the preceding items"); *Pooh-Bah Enterprises, Inc. v. County of Cook*, 232 Ill. 2d 463, 492 (2009) ("Under the *ejusdem generis* doctrine, when a statutory clause specifically describes several classes of persons or things and then includes 'other persons or things,' the word 'other' is interpreted to mean 'other such like.' ").

¶ 59    We emphasize, however, that the canon *ejusdem generis* is not some inexorable command that must always result in limiting the general terms by virtue of the specific ones that precede it; sometimes, the language is not readily susceptible to such a limitation, or the canon

15

would result in an outcome contrary to the intent of the contracting parties or the legislature. See, *e.g.*, *Southwest Airlines Co. v. Saxon*, 596 U.S. ___, ___, 142 S. Ct. 1783, 1791-92 (2022) ("*Ejusdem generis* neither demands nor permits that we limit a broadly worded catchall phrase based on an attribute that inheres in only one of the list's preceding specific terms."); *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 227 (2008) ("we do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase"); *McReynolds v. People*, 230 Ill. 623, 633 (1907) ("The rule *ejusdem generis*, moreover, does not apply 'where the specific words signify subjects greatly different from one another, for here the general expression might very consistently add one more variety; in such case, the general term must receive its natural and wide meaning.' "); *Interstate Steel Co. v. Ramm Manufacturing Corp.*, 108 Ill. App. 3d 404, 406-07 (1982) (*ejusdem generis* not applicable when it is clear that invoking canon would lead to result contrary to intent of contracting parties).

¶ 60     In applying this canon, we begin, as in *West Bend*, with the exclusion's title. Our exclusion is entitled, "Recording And Distribution Of Material Or Information In Violation Of Law." Unlike the title in *West Bend*, this title is not limited to modes of communication. True, the word "distribution" may not add anything materially different from the title in *West Bend*, 2021 IL 125978, ¶ 58, which referred to statutes governing the "sending" of material or information. But the word "recording" is a different story.

¶ 61     "Recording" is the gerund of the verb "record," which has many meanings but which, relevant here, the dictionaries define as "to cause (sound, visual images, data, etc.) to be registered on something (such as a disc or magnetic tape) in reproducible form."[1] Another

---

[1] Merriam-Webster Online Dictionary, "Record;" https://www.merriam-webster.com/dictionary/record (site last visited Oct. 12, 2023).

defines it as "to put or set down in writing or some other permanent form."[2] Another: "to set down in writing or the like, as for the purpose of preserving evidence."[3] Finally: "to keep information for the future, by writing it down or storing it on a computer," or "to store sounds or moving pictures using electronic equipment so that they can be heard or seen later."[4] Indeed, even the noun form of "record," when used in this context, means "[i]nformation that is inscribed on a tangible medium or that, having been stored in an electronic or other medium, is retrievable in perceivable form."[5]

¶ 62    Beyond the differences in titles, the statutes specifically listed in our exclusion here are more numerous, too. Our exclusion includes the TCPA and CAN-SPAM Act, as in *West Bend*, but also the Fair Credit Reporting Act (FCRA) (15 U.S.C. § 1681 *et seq.* (2018)) and its amendment, the Fair and Accurate Credit Transactions Act of 2003 (FACTA) (15 U.S.C. § 1601 *et seq.* (2018)).

¶ 63    As discussed, the TCPA and CAN-SPAM Act govern unsolicited communications via phone, fax, or e-mail. See *West Bend*, 2021 IL 125978, ¶ 58. In contrast, the FCRA "seeks to promote 'fair and accurate credit reporting' and to protect consumer privacy" by "regulat[ing] the consumer reporting agencies that compile and disseminate personal information about consumers." *TransUnion LLC v. Ramirez*, 594 U.S. ___, ___, 141 S. Ct. 2190, 2200 (2021). Indeed, "the FCRA's protection of consumer credit information is akin to the common law's protection of private information through the tort of invasion of privacy. To safeguard consumer credit information, Congress *** [made] it unlawful to furnish, obtain, or use a consumer's

---

[2] Oxford English Online Dictionary, "Record;" https://www.oed.com/search/dictionary/?scope=Entries&q=record (site last visited Oct. 12, 2023).

[3] Dictionary.com, "Record;" https://www.dictionary.com/browse/record (site last visited Oct. 12, 2023).

[4] Cambridge Online Dictionary, "Record;" https://dictionary.cambridge.org/dictionary/english/record (site last visited Oct. 12, 2023).

[5] RECORD, Black's Law Dictionary (11th ed. 2019).

credit information without a permissible purpose." *Persinger v. Southwest Credit Systems, L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021).

¶ 64     Clearly, the FCRA and FACTA do not share the same theme of the TCPA and CAN-SPAM Act, which govern "methods of communication." *West Bend*, 2021 IL 125978, ¶ 58. Other courts reviewing this identical language concur. See *Wynndalco*, 70 F.4th at 1002 ("Plainly, it is not possible here as it was in [*West Bend*] to limit the exclusion to statutes regulating methods of communication ***."); *Cheese Merchants*, 631 F. Supp. 3d at 518; *Citizens Insurance Co. of America v. Wynndalco Enterprises, LLC*, 595 F. Supp. 3d 668, 675 (N.D. Ill. 2022), *aff'd*, 70 F.4th 987.

¶ 65     But that does not mean that the four statutes could not share some other common theme. When employing the *ejusdem generis* canon, " '[t]he common quality suggested by a listing should be its most general quality—the least common denominator, so to speak—relevant to the context.' " *Cheese Merchants*, 631 F.Supp. 3d at 521 (quoting Antonin Scalia & Bryan A. Garner, Reading Law The Interpretation of Legal Texts 196 (2012)).

¶ 66     The CNA plaintiffs argue that there is, in fact, a theme common to these listed statutes, even if it is not the same theme as in *West Bend*. In their different ways, they say, these statutes and other laws share the common denominator of protecting personal privacy.

¶ 67     Recall that our supreme court, in finding that a BIPA violation fell within the policy's coverage for publication of material that violates one's personal privacy, noted that "the right to privacy includes two primary privacy interests: seclusion and secrecy" and deemed a BIPA violation as falling within the secrecy interest: "the right of an individual to keep his or her personal identifying information like fingerprints secret." *West Bend*, 2021 IL 125978, ¶¶ 45-46.

¶ 68     The Seventh Circuit agreed that the four statutes listed in our exclusion "encompass two

18

distinct types of privacy: seclusion and secrecy." *Wynndalco*, 70 F.4th at 1003. The TCPA and CAN-SPAM Act address seclusion, "the right to be left alone" (*id.*), while the FCRA and FACTA concern secrecy, "the right to maintain the confidentiality of one's personal information." *Id.*; see *Cheese Merchants*, 631 F. Supp. 3d at 518 (FCRA and FACTA "address a different type of privacy" than TCPA and CAN-SPAM Act).

¶ 69    The Seventh Circuit, however, disagreed that the four statutes in the violation-of-law exclusion could be grouped together under a general theme of protecting privacy. There was "nothing in the language of the exclusion—be it in the title or in any of the provisions that follow—which points to privacy as the focus of the exclusion." *Wynndalco*, 70 F.4th at 1003. The court did not find that theme to be "obvious to the type of layperson or business purchasing this policy." *Id.* In the court's view, it would require "a relatively sophisticated and nuanced examination of the four statutes" to glean a theme of protecting personal privacy. *Id.* at 1003-04.

¶ 70    We agree that in employing the *ejusdem generis* canon, we should read the language from the standpoint of the insured; we should *always* interpret an insurance policy from that viewpoint. See *Founders*, 237 Ill. 2d at 433. But respectfully, we think the Seventh Circuit gave too little credit to the reasonable person purchasing this business liability policy. We do not consider it particularly nuanced to note that the TCPA and CAN-SPAM Act deal with a consumer's freedom from unwanted solicitations, while the FCRA and FACTA protect a consumer's confidentiality in his or her financial information. Nor do we deem it especially sophisticated for an insured purchasing this business liability insurance to understand that these groups of statutes touch on various aspects of an individual's personal privacy, though not precisely in the same way.

¶ 71    We would likewise find more significance in the title and in the language of the catchall

provision than did the Seventh Circuit. But first, we must flag one point here about the title. As noted above, the Seventh Circuit found nothing in the title of the exclusion hinting at a theme of privacy. *Wynndalco*, 70 F.4th at 1003. But this is the one difference that exists between the exclusion the Seventh Circuit considered and the one before us. While everything else in the exclusion is all but identical—with only the most inconsequential differences—the title of the exclusion in the Seventh Circuit's *Wynndalco* decision was "Distribution of Material in Violation of Statutes." *Id.* at 993. In contrast, the title of the exclusion before us is "*Recording* And Distribution Of Material *Or Information* In Violation Of Law." (Emphasis added.)

¶ 72     That is no small difference. We might agree with the Seventh Circuit that the phrase "distribution of material" does not scream "privacy." But the same cannot be said of our title. The "[r]ecording *** of *** information in violation of law" certainly brings to mind the secrecy prong of the privacy interest—the notion of illegally taking and keeping a record of one's information. Indeed, it is hard to imagine what else it *could* mean; in what other context would it be illegal to keep a record of someone's information, if it were not personal, confidential information?

¶ 73     Likewise, we disagree with the Seventh Circuit that the language of the catchall does not admit of a privacy gloss. Again, the catchall references the violation of any statute, ordinance, or regulation, besides the four statutes specified, that governs the "printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information." Some of those words only make sense in the context of the secrecy element of privacy—disposal, collecting, and recording of information. The others are entirely consistent with privacy, though not limited to privacy. But taken together with the title's reference to "recording *** of *** information," and with the four statutes that address personal privacy in

their different ways, we do not find it unreasonable at all to read into this exclusion the gloss of statutes that protect personal privacy.

¶ 74    So once again—we could stop there. We could determine that the plain and ordinary interpretation of the catchall exclusion includes BIPA violations, as we did earlier, or we could find, as we have just done, that the doctrine of *ejusdem generis* limits the scope of the catchall to the violation of statutes or other laws that protect personal privacy—which would *still* include violations of BIPA. Either way, violations of BIPA are included within the catchall exclusion, and the CNA plaintiffs owe no duty to defend.

¶ 75    Still attempting to find a limiting gloss, and unable to do so with *ejusdem generis*, the Seventh Circuit next employed the related canon *noscitur a sociis* (*id.* at 1004), which means "it is known from its associates." (Internal quotation marks omitted.) *American Family Mutual Insurance Co., S.I. v. Carnagio Enterprises, Inc.*, No. 20 C 3665, 2022 WL 952533, at * 9 (N.D. Ill. Mar. 30, 2022); see *Dynak v. Board of Education of Wood Dale School District 7*, 2020 IL 125062, ¶ 22.

¶ 76    We will not belabor the point; the Seventh Circuit could not find a limiting gloss based on that canon for the same reason it could not with *ejusdem generis*. See *Wynndalco*, 70 F.4th at 1004 ("As we have discussed, there are no readily-discernible clues in the text surrounding the catch-all provision that point to privacy as the factor that harmonizes the catch-all with the other provisions of the violation-of-statutes exclusion.").

¶ 77    In the end, it makes no difference to the outcome of our analysis whether we employ the limiting gloss of *ejusdem generis*, because the result is the same. If we limit the meaning of the catchall phrase as limited to the protection of personal privacy, the catchall excludes coverage for liability arising from BIPA lawsuits, which clearly concern personal privacy. If we cannot

21

limit that catchall phrase, then the phrase is given its full breadth as written—and likewise excludes coverage for BIPA liability. See *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 589 (1980) (rejecting attempt to limit phrase based on *ejusdem generis* and construing phrase "to mean exactly what it says, namely, *any other* final action." (emphasis in original)); *People v. Diggins*, 235 Ill. 2d 48, 57 (2009) (rejecting State's attempt to limit meaning of "case" based on *noscitur a sociis* canon; "we conclude that the legislature used the broad general term 'case' unmodified"); *Cheese Merchants*, 631 F. Supp. 3d at 517 (construing same catchall exclusion as here: "Unless there is a discernible principle running through all of the specifics, *ejusdem generis* does not apply, and the general term receives its full breadth.").

¶ 78    Simply summarized, the catchall provision is amenable to a reasonable limiting construction of statutes or other laws that protect personal privacy. BIPA is clearly one such statute. So an underlying lawsuit alleging a violation of BIPA would fall under the catchall phrase of the violation-of-laws exclusion. But even if we were wrong and the *ejusdem generis* canon is incapable of limiting the scope of the catchall phrase, the result would be the same. Absent some limiting gloss, the phrase receives its full breadth. The catchall, without a limiting gloss, plainly and obviously includes BIPA lawsuits. In either event, the exclusion applies, and the CNA plaintiffs owed no duty to defend.

¶ 79                                                    B

¶ 80    The Seventh Circuit took a different path and ultimately reached the opposite conclusion. Though it found no interpretive canon helpful in cabining the breadth of the catchall language, the court did not proceed as we would have expected and apply the language as written, without limitation. Instead, in effect, the Seventh Circuit found the language *too* broad—that is, so broad that it would eviscerate a good amount of the coverage offered by the insurer. From that, the

court declared the entire catchall phrase ambiguous, at which point it relied on the doctrine that ambiguous provisions in an insurance policy are resolved in favor of the insured. See *Wilson*, 237 Ill. 2d at 456. And thus, the violation-of-law exclusion did not apply, and the insurer owed a duty to defend. As we explain in more detail below, we disagree with the Seventh Circuit's reasoning and holding.

¶ 81    The Seventh Circuit began its analysis by writing that, under Illinois law, "a court should construe a policy so as to harmonize its provisions and avoid reading an exclusion in such a way that it removes the coverage explicitly provided elsewhere in the policy." *Wynndalco*, 70 F.4th at 996. The court explained that,

> "[i]n some instances, the language of a policy exclusion may appear clear in isolation, but when compared with a separate policy provision granting coverage for the same type of action or injury that the exclusion ostensibly reaches, an ambiguity arises, in that the exclusion appears to take away with one hand coverage that the policy purports to give with the other. [Citations.] The cases sometimes refer to this as the exclusion appearing to 'swallow' the coverage that the policy purports to grant the insured." *Id.*

¶ 82    Though the court recognized that "[t]here is no dispute that a literal, plain-text reading of the catch-all provision would include BIPA violations" (*id.* at 997), the court thought the catchall provision was just such an example of an exclusion that "swallowed" the coverage provision, thereby rendering it ambiguous:

> "[A] plain-text reading of the exclusion gives rise to an ambiguity with respect to what the policy does or does not cover. The Citizens policy purports, in the first instance, to provide liability coverage for a 'personal and advertising injury,' which the policy defines broadly to include not only the oral or written publication of material that violates

23

a person's right of privacy [citation] but also, *inter alia*, the oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services [citation]; the use of another's advertising idea in one's own "advertisement," [citation]; and infringing upon another's copyright, trade dress, or slogan in one's own "advertisement" [citation]. [Citation.] These are all injuries that are subject to, or potentially subject to, statutory causes of action. [Citations.] Reading the exclusion's catch-all provision literally and broadly would essentially exclude from the policy's coverage injuries resulting from all such statutory prohibitions, as they all have to do with the recording, distribution, and so forth of information and material." *Id.* at 997-98.

¶ 83    Because, in the court's view, "the broad language of the catch-all exclusion purports to take away with one hand what the policy purports to give with the other in defining covered personal and advertising injuries," the exclusion was ambiguous, and the ambiguity must be resolved in favor of coverage. *Id.* at 998.

¶ 84    We cannot agree with the Seventh Circuit's analysis. We do not find it to be an accurate reflection of Illinois law. We find two fundamental flaws in the court's reasoning. First, under Illinois law, the fact that an exclusion has a "broad sweep" (*id.* at 1004) is not, in and of itself, a reason to deem the coverage "illusory" (*id.* at 998). It is only when the exclusion has the effect of "swallowing" (*id.*) the coverage *entirely* that the exclusion can be deemed illusory—and this is plainly not the case here. And second, the fact that the exclusion might "conflict" (*id.*) or "clash" (*id.* at 1004) with other provisions of the coverage *that are not presently at issue in this case* is not a basis to invalidate the exclusion as applied to *this* case; our job is not to seek out other problems and solve them, but rather to adjudicate the controversy presently before us. We

explain our reasoning below.

¶ 85                                                          1

¶ 86    We start with the beginning of the court's analysis, when the court spoke of the need to "avoid reading an exclusion in such a way that it removes the coverage explicitly provided elsewhere in the policy," what it referred to as the exclusion " 'swallowing' " or "nullify[ing]" the coverage explicitly provided. *Id.* at 996. For that proposition, the court cited several decisions from Illinois. We do not read those cases nearly as broadly as the Seventh Circuit.

¶ 87    Several of those decisions—the source of the "swallowing" and "nullifying" comments— concerned an intentional-act exclusion in a homeowner's liability policy that, if read literally, would exclude coverage not only for intentional acts but for negligent and innocent acts— meaning *all* acts, rendering the coverage illusory. See *Lincoln Logan Mutual Insurance Co. v. Fornshell*, 309 Ill. App. 3d 479, 484 (1999) ("If the exclusionary clause denied coverage for negligent or innocent acts as well, the clause would contradict and swallow the entire personal liability policy."); *General Agents Insurance Co. of America, Inc. v. Midwest Sporting Goods Co.*, 328 Ill. App. 3d 482, 486 (2002) ("The policy purports to exclude coverage for any injury arising from an intentional act, regardless of whether the insured intended or expected the injury. This clause, read expansively in favor of the insurer, would nullify coverage for almost all negligent acts."); *Bohner v. Ace American Insurance Co.*, 359 Ill. App. 3d 621, 627 (2005) (McLaren, J., dissenting) ("it is contrary to the parties' intentions to interpret such a provision to deny coverage for negligent or innocent acts as well, because the clause would contradict and swallow the entire personal liability policy").

¶ 88    These cases cited by the Seventh Circuit stand for the common-sense proposition that an insurer's interpretation of an exclusion will not be adopted if that interpretation would altogether

eliminate or "swallow" the coverage on which the insured relies. An exclusion that is interpreted to deny coverage for not only intentional acts but also accidental and negligent acts results in a policy that covers *no* acts. Insureds may choose to limit their coverage and pay reduced premiums accordingly, but nobody would buy insurance that provides no coverage whatsoever. But as we will explain below, we do not face that situation here; the exclusion at issue here does not come close to wholly erasing the insured's coverage.

¶ 89    The remaining cases cited by the Seventh Circuit are garden-variety examples of conflicts in language that generate an ambiguity, resulting in an interpretation that favors the insured. In *Jones v. Universal Casualty Co.*, 257 Ill. App. 3d 842, 849 (1994), a "notice" provision in the policy allowed the insured to seek coverage within two years of the accident. This notice provision specifically identified any claim under "part II" of the policy within its scope. *Id.* When the insured sought recovery for a hit-and-run accident, which fell within part II of the policy, the insurer claimed that the insured violated a more restrictive notice provision for hit-and-run accidents. *Id.* This court noted "a conflict between the notice provisions of the policy," which it resolved in favor of the insured. *Id.*

¶ 90    *Mosby v. Mutual Life Insurance Co. of New York*, 405 Ill. 599, 601 (1950), concerned disability policies. The heading of the policy, bold and enlarged, read: " 'Benefits in the Event of Total and Permanent Disability Before Age 60.' " *Id.* The policy language required that the insured, " 'before attaining the age of sixty years *** furnish due proof' " of disability. *Id.* The insurer argued that, even if the insured became disabled before age 60, he was not entitled to coverage because he did not *furnish proof* of that disability before age 60. Our supreme court deemed the contrast between the bold, large-print promise and the fine-print language "so misleading as to create an ambiguity which must be resolved in favor of the insured." *Id.* at 607.

26

¶ 91    In another case, *Yates v. Farmers Automobile Insurance Ass'n*, 311 Ill. App. 3d 797, 798 (2000), the insured purchased insurance for two vehicles with $50,000 in uninsured-motorist coverage for each vehicle. After an accident, he sought to "stack," or aggregate, the two coverages into $100,000 in coverage. *Id.* The policy contained an anti-stacking provision, but the declarations page listed coverage for each vehicle as "50/100"—meaning coverage of $100,000 per accident. *Id.* at 800. In other words, the declarations language said the insured could stack, but another provision said he could not. This court found that "[t]he insurance policy contains provisions that are ambiguous and contradictory" and thus construed the ambiguity in favor of the insured, granting him $100,000 of coverage. *Id.*[6]

¶ 92    We have no quarrel with any of these decisions cited by the Seventh Circuit, but we take issue with how the Seventh Circuit applied those decisions to reach its decision. We have several reasons, both general in nature and specific to the exclusion at issue here.

¶ 93    The general observation is that we must be extremely careful when talking about "conflicts" in policy language because every exclusion, to some degree, conflicts with the coverage provision. That is the very reason for the exclusion; it is an exception to the general rule of coverage. Which is why they must be specifically stated in the policy—if they were not, the general rule of coverage would apply. See *Rich v. Principal Life Insurance Co.*, 226 Ill. 2d 359, 379 (2007) ("An exclusion in an insurance policy serves the purpose of taking out persons or events otherwise included within the defined scope of coverage." (Internal quotation marks omitted.)). But the mere fact that an exception conflicts with the coverage provision does not, in

---

[6]We glean little from the final case cited by the Seventh Circuit, *Perry v. Fidelity National Title Insurance Co.*, 2015 IL App (2d) 150168. The discussion of a "conflict" there involved an argument by the insurer that a particular provision excluded coverage, but we deemed that argument forfeited, given that the insurer did not develop an argument or even cite the language of the exclusion. *Id.* ¶ 17.

and of itself, make it ambiguous—if it did, no exclusion would ever be upheld.

¶ 94    Conflict and ambiguity are not the same thing. If one were to say, "I love all vegetables, except for asparagus," the dislike of asparagus would conflict with the love of all vegetables. But we would have no trouble understanding what was said. And if the exception were significantly broader—"I love all vegetables except green ones"—we could still make sense of the statement. Those are conflicts, but they are not ambiguous in the least.

¶ 95    On the other hand, if one said, "I love all vegetables except those that are grown," we would scratch our heads, as the exception does not just conflict with the rule but swallows it whole. It is tantamount to saying, "I love all vegetables, except I do not love any vegetables."

¶ 96    So if the exclusion wipes out all coverage, it is deemed illusory. Just as we saw in the cases above: "We cover liability for all non-intentional acts, except we don't cover negligent or innocent acts—so basically, we don't cover anything." See *Fornshell*, 309 Ill. App. 3d at 484; *Midwest Sporting Goods*, 328 Ill. App. 3d at 486; *Bohner*, 359 Ill. App. 3d at 627 (McLaren, J., dissenting).

¶ 97    But the mere breadth of an exclusion, alone, does not equate to ambiguity, nor does it render the coverage illusory. "The policy need not provide coverage against all possible liabilities; if it provides coverage against some, the policy is not illusory." *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 362 Ill. App. 3d 745, 754 (2005), *aff'd*, 223 Ill. 2d 407 (2006); see *American Country Insurance Co. v. Kraemer Brothers, Inc.*, 298 Ill. App. 3d 805, 814 (1998) (policy was not illusory, even though it excluded claims for negligence, as it covered claims of strict liability; "Just because there are fewer strict liability claims than negligence claims does not make the coverage illusory."); *Mashallah, Inc. v. West Bend Mutual Insurance Co.*, No. 20 C 5472, 2021 WL 679227, at *4 (N.D. Ill. Feb. 22, 2021) (applying

Illinois law), *aff'd*, 20 F.4th 311 (7th Cir. 2021).

¶ 98    In any event, we do not agree that the catchall exclusion here eviscerates the coverage provision on which the insured relies. As noted earlier, the subpart of the "personal and advertising injury" coverage on which the insured relies, subpart (e), provides coverage for liability arising from "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." And the catchall exclusion, again, denies coverage for liability arising from the violation of statutes or other laws that govern "the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information."

¶ 99    Does the catchall exclusion completely eliminate coverage under subpart (e)? Far from it. True, it excludes all *statutory* causes of action. But it does not exclude any common-law actions whatsoever, and thus it would not exclude any of the "four ways to state a [common-law] cause of action for invasion of privacy in Illinois: (1) intrusion upon the seclusion of another, (2) appropriation of another's name or likeness, (3) public disclosure of private facts, and (4) publicity placing another in a false light." *Flores v. Aon Corp.*, 2023 IL App (1st) 230140, ¶ 51; see *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 33 & n.4; *Busse v. Motorola, Inc.*, 351 Ill. App. 3d 67, 71 (2004).

¶ 100    Each of these four privacy-based causes of action easily fits within subsection (e)'s coverage for the publication of material that violates a person's right to privacy. See *Flores*, 2023 IL App (1st) 230140, ¶ 51 (elements of intrusion upon seclusion are "(1) the defendant committed an unauthorized intrusion or prying into the plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matter intruded on was private; and (4) the intrusion caused the plaintiff anguish and suffering" (internal quotation

marks omitted)); *Ainsworth v. Century Supply Co.*, 295 Ill. App. 3d 644, 648 (1998) (to state claim for appropriation of likeness or name, complaint must allege "an appropriation, without consent, of one's name or likeness for another's use or benefit" (internal quotation marks omitted)); *Miller v. Motorola, Inc.*, 202 Ill. App. 3d 976, 978 (1990) (to state claim for public disclosure of private facts, complaint must allege that "(1) publicity was given to the disclosure of private facts; (2) the facts were private, and not public, facts; and (3) the matter made public was such as to be highly offensive to a reasonable person"); *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 418-19 (1989) (cause of action for false-light invasion of privacy requires showing that defendant gave publicity to matter concerning plaintiff that placed plaintiff in false light).

¶ 101   Companies face these lawsuits for such things as allowing the disclosure of "private facts about plaintiffs, such as their financial history, medical history, and beneficiary information." *Flores*, 2023 IL App (1st) 230140, ¶ 52. Or for spying on one's own employees and thus obtaining private information about employees' "family problems, health problems, sex lives, future work plans, and attitudes about [the employer]." *Johnson v. K Mart Corp.*, 311 Ill. App. 3d 573, 579 (2000).

¶ 102   Indeed, for what it's worth, in *dicta*, a concurring judge on another case before the Seventh Circuit hinted that even BIPA violations, themselves, might be capable of reduction to common-law claims; a BIPA violation could, in theory, "be comparable to injuries in invasion-of-privacy and unjust enrichment cases that the law has long recognized." *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1249 (7th Cir. 2021) (Hamilton, J., concurring). The judge cited a Restatement provision concerning the appropriation of another's name or likeness for one's own use or benefit, the very provision on which Illinois decisions rely to recognize that common-law

invasion-of-privacy action. See *id.* (Hamilton, J. concurring) (citing Restatement (2d) of Torts § 652C (1977)); *Ainsworth*, 295 Ill. App. 3d at 648.

¶ 103   Each of these common-law invasion-of-privacy claims would be covered by the policy per subsection (e), and none of them would be excluded by the catchall provision, which only excludes liability for statutory actions. So in no way could we conclude that the catchall exclusion wholly eviscerates or "swallows" subsection (e)'s coverage.

¶ 104   Nor, subsection (e) aside, could we say that the catchall exclusion eliminates the vast majority of the other coverage under "personal and advertising injury." The catchall would not preclude coverage for subparts (a) through (c) of the coverage—liability for false arrest, false imprisonment, malicious prosecution, wrongful eviction, or trespass. None of those involve the dissemination, recording, collection, or disposal of materials or information. And those causes of action are usually, if not always, asserted as common-law actions, not violations of statute.

¶ 105   Subpart (d), governing oral or written defamation, could be asserted as a statutory action—a violation of the Slander and Libel Act (740 ILCS 145/0.01 *et seq.* (West 2022))—but defamation actions are routinely prosecuted as common-law actions in Illinois courts; they are, in fact, far more common than statutory defamation claims. Our exclusion would not bar coverage for a common-law defamation claim.

¶ 106   As for subsection (f) of the "personal and advertising injury" coverage, while the Seventh Circuit correctly noted that claims for disparagement of one's goods or services may be redressable under a state statute, common-law claims may arguably lie, as well. See, *e.g.*, *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 367 Ill. App. 3d 48, 60 (2006) ("Illinois recognizes commercial disparagement as a tort separate and distinct from the tort of defamation."), *aff'd in part, rev'd in part on other grounds*, 227 Ill. 2d 381 (2008); *Kole v.*

*Village of Norridge*, 941 F. Supp. 2d 933, 963-64 (N.D. Ill. 2013) (applying Illinois law and noting split in Illinois authority as to whether common-law claim of commercial disparagement is recognized as separate tort from defamation).

¶ 107    So we are not presented with a situation where the violation-of-law exclusion swallows or wholly nullifies the coverage for "advertising and personal injury." And specific to our case, the provision on which the insured relies for coverage, subsection (e) for the publication of materials that violate one's right to privacy, includes many common-law claims that the catchall exclusion would not touch.

¶ 108    And that, under Illinois law, should be the end of any discussion that this catchall exclusion is illusory. To again quote Justice Wolfson, "[a] policy need not provide coverage against all possible liabilities; if it provides coverage against some, the policy is not illusory." *Nicor*, 362 Ill. App. 3d at 754; see *Kraemer Brothers*, 298 Ill. App. 3d at 814.

¶ 109    If we stray from that doctrine, we would have to start asking such unanswerable questions as, "How broad an exclusion is too broad?" or "What percentage of the coverage can be excluded (51 percent? 80 percent?) before the coverage is deemed illusory?" And doing so will drag us into the dangerous zone of interfering with freedom of contract, for sometimes the insured knowingly obtains limited coverage, and the premiums are set accordingly. See *Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 215 (1997) (public policy of Illinois favors freedom of contract); *American Country Insurance Co. v. Cline*, 309 Ill. App. 3d 501, 506-09 (1999) (coverage was not illusory, as it contained some limited coverage, and parties were free to contract as such); *Liberty Mutual Fire Insurance Co. v. Statewide Insurance Co.*, 352 F.3d 1098, 1101 (7th Cir. 2003) (applying Illinois law; coverage, though limited, was not illusory; parties' right to freely contract should not be abridged unless coverage is entirely illusory).

¶ 110   Because the catchall exclusion here did not eviscerate all or even nearly all coverage for a "personal and advertising injury," it cannot be deemed illusory.

¶ 111                                                                  2

¶ 112   Though it did not find the catchall exclusion *wholly* illusory, the Seventh Circuit was particularly concerned with the last two subparts of "personal and advertising injury"—namely, coverage for liability arising from "the use of another's advertising idea in your advertisement" and for "infringing upon another's copyright, trade dress or slogan in your advertisement." See *Wynndalco*, 70 F.4th at 997.  In those instances, the court noted, the only possible causes of action to redress those violations were *statutory* causes of action that would be nullified by the catchall exclusion. See *id.* at 997-98 (citing 15 U.S.C. § 1125(a), (c) (2018) (Lanham Act), 17 U.S.C. § 501 (2018) (federal Copyright Act of 1976 provision for civil infringement actions), and 765 ILCS 1036/60 (West 2022) (Trademark Registration and Protection Act provision for infringement suit)).

¶ 113   We would first note that, if our interpretive limiting gloss were applied to the catchall exclusion—the violation of statutes or other laws that protect personal privacy—this would not be a problem. None of these infringement or advertisement-misappropriation statutes would fall within the exclusion as so limited; they do not implicate personal privacy interests. Indeed, that is yet another reason to *adopt* our limiting gloss—we should construe policy language, when possible, to avoid "nullify[ing] or render[ing] provisions meaningless." *Thompson v. Gordon*, 241 Ill. 2d 428, 442 (2011); see *Founders*, 237 Ill. 2d at 433 ("When construing the language of an insurance policy, we must assume that every provision was intended to serve a purpose.").

¶ 114   That aside, the Seventh Circuit's point establishes, at most, that the catchall exclusion might irreconcilably conflict with a few provisions of the "personal and advertising injury"

coverage. That may be so, but these provisions are not at issue in this case. The Seventh Circuit identified ambiguities elsewhere in the policy, not in a comparison of the policy language directly applicable to this case.

¶ 115   If that language were directly applicable to our decision—if, for example, the underlying lawsuit were not a BIPA action but involved the Copyright Act of 1976—we would take that question head-on. Presumably, we would either find an ambiguity in the conflict and resolve it in favor of the insured, or we might invoke the canon we just mentioned and construe the policy so as not to render any term meaningless—and likewise construe in favor of coverage.

¶ 116   But that language is not directly before us. We are aware of no authority in Illinois law, nor did the Seventh Circuit cite any, for the proposition that a hypothetical conflict in language that was not at issue before the court could permit the court to essentially nullify an entire coverage exclusion as illusory, even though there is no such conflict between the coverage and exclusion provisions at issue in the case before the court.

¶ 117   To the contrary, we do not search for other wrongs to right; we do not issue advisory opinions; we resolve the controversy before us. *People v. Austin M.*, 2012 IL 111194, ¶ 134; *People v. Givens*, 237 Ill. 2d 311, 323-24 (2010); *People ex rel. Partee v. Murphy*, 133 Ill. 2d 402, 407-08 (1990). Here, the insured identifies specific language in the "personal and advertising injury" provision that entitles it to coverage for a BIPA lawsuit—subsection (e), the publication of materials that violate personal privacy. The catchall exclusion clearly covers BIPA liability, but it does not eviscerate subsection (e)'s coverage completely; it only excludes statutory claims, and plenty of common-law claims remain covered by that subsection. So the exclusion is valid, and it applies. That should be the beginning and end of the analysis.

¶ 118   Make no mistake: we fully understand that a court may consider the insurance policy as a

whole. See *Nicor, Inc. v. Associated Electric & Gas Insurance Services Ltd.*, 223 Ill. 2d 407, 416 (2006). But we do so for context, so we can give meaning to the competing provisions *at issue in the case before us*. So there is certainly nothing wrong with taking into account subsections (f) and (g) of the "personal and advertising injury" regarding advertising misappropriation and intellectual property infringement when interpreting the catchall exclusion.

¶ 119   But it is improper to comb the policy for other conflicts or ambiguities and use them to rule on the language before us. That sounds like an analysis more fitting to a constitutional overbreadth challenge to determine if the exclusionary language simply sweeps too broadly and might improperly impact other provisions in the policy. If the court were allowed to do that, then every insurance-coverage case would turn into an overall referendum on the policy as a whole, rather than a pinpoint analysis of a particular coverage provision versus a particular exclusion.

¶ 120   The underlying lawsuit here concerns BIPA. Liability for a BIPA violation is unambiguously excluded from coverage. We thus respectfully disagree with the Seventh Circuit's decision in *Wynndalco* and hold that the CNA plaintiffs owed no duty to defend the underlying BIPA lawsuit.

¶ 121   In light of this holding, we need not consider the other policy exclusions on which the CNA plaintiffs rely to disclaim coverage.

¶ 122                                                                       III

¶ 123   We next consider Sanchez's claim of estoppel. He says that, because the CNA plaintiffs did not defend the underlying BIPA action under a reservation of rights or promptly file a declaratory judgment action asserting that they owed no duty to defend, they are estopped from now denying coverage. That is not a correct statement of the law.

¶ 124   The doctrine of estoppel in this context holds that, if an insurer believes that it owes no

duty to defend, but it wishes to preserve any policy defenses it may have, it must do one of two things: (1) file suit, seeking a declaratory judgment that it owes no duty to defend, or (2) defend the suit under a reservation of rights. *Employers Insurance of Wausau v. Ehlco Liquidating Trust*, 186 Ill. 2d 127, 150 (1999). If the insurer does neither of those things, the insurer will be estopped later from asserting any policy defenses to coverage. *Id.* at 150-51.

¶ 125   But estoppel does not even factor into the equation if the court ultimately determines that the insurer owed no duty to defend. *Id.* at 151. It is only if the insurer did, in fact, owe a duty to defend that estoppel is even an issue. See *id.* at 151-52 ("Once the insurer breaches its duty to defend, however, the estoppel doctrine has broad application and operates to bar the insurer from raising policy defenses to coverage, even those defenses that may have been successful had the insurer not breached its duty to defend."); *Uhlich Children's Advantage Network v. National Union Fire Co. of Pittsburgh*, 398 Ill. App. 3d 710, 716 (2010) ("Because the estoppel doctrine applies only where an insurer has breached its duty to defend, a court first 'inquires whether the insurer had a duty to defend and whether it breached that duty.' " (quoting *Ehlco*, 186 Ill. 2d at 151)).

¶ 126   Sanchez's confusion may come from the language in the case law that an insurer who fails to either timely file a declaratory judgment action or defend with a reservation of rights is estopped from asserting "policy defenses to coverage." *Ehlco*, 186 Ill. 2d at 150-51. Merely arguing in court that the insurer does not owe a duty to defend is not asserting a "policy defense" as that term is intended. A "policy defense" is, for example, a defense that the insured did not file a timely claim or otherwise failed to comply with some condition precedent to coverage in the policy. See *id.* at 152-53 (considering whether estoppel barred insurer from claiming late of notice of claim); *Uhlich*, 398 Ill. App. 3d at 721 (after holding that insurer had duty to defend,

36

holding that insurer was estopped from asserting late-notice provision in policy because it did not promptly file declaratory judgment action or defend with reservation of rights).

¶ 127   Another example is a "voluntary assumption" provision requiring that, before the insured "make[s] a payment; assume[s] any obligation; or incur[s] any expense" arising from liability, the insured must obtain the insurer's consent. See *American Safety Casualty Insurance Co. v. City of Waukegan*, 776 F. Supp. 2d 670, 700-01 (N.D. Ill. 2011) (applying Illinois law; after ruling that insurer owed duty to defend, finding that insurer was estopped from asserting "voluntary assumption" policy defense), *aff'd*, 678 F.3d 475 (7th Cir. 2012).

¶ 128   To hold otherwise, to allow the estoppel question to precede the duty-to-defend question, would be to give estoppel the power to magically rewrite a policy from one that does not obligate the insurer to defend into one that does. Because the "estoppel doctrine applies only where an insurer has breached its duty to defend" (*Ehlco*, 186 Ill. 2d at 151), and we have determined that the CNA plaintiffs owed no duty to defend Visual Pak in the underlying lawsuit, the estoppel doctrine has no application here.

¶ 129   The circuit court originally put the cart before the horse, considering the claim of estoppel first and ruling against the CNA plaintiffs on that basis. But on reconsideration, the court correctly reversed course, understanding that the question of duty-to-defend came first. After determining that the CNA plaintiffs owed no duty to defend the underlying BIPA lawsuit, the court correctly deemed the question of estoppel moot. We find no error in the circuit court's ultimate judgment.

¶ 130                                   CONCLUSION

¶ 131   The judgment of the circuit court is affirmed.

¶ 132   Affirmed.

---

*National Fire Insurance Co. of Hartford v. Visual Pak Co.*, **2023 IL App (1st) 221160**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2020-CH-06897; the Hon. Thaddeus L. Wilson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Bradley K. Staubus, of Esposito & Staubus LLP, of Burr Ridge, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Todd S. Schenk and Jamie L. Gende, of Tressler LLP, of Chicago, for appellees. |

---

| | |
|---|---|
| *Amicus Curiae*: | Molly McGinnis Stine and Hugh S. Balsam, of Locke Lord LLP, of Chicago, for *amicus curiae* American Property Casualty Insurance Association. |

---